EDMONDS v. SPANISH RIVER PULP & PAPER CO., Limited.

(District Court, E. D. Wisconsin. April 3, 1913.)

1. VENDOR AND PURCHASER (§ 44*)—RESCISSION FOR FRAUD AND MISREPRESENTATION—SUFFICIENCY OF EVIDENCE.

Evidence considered, and *held* not to sustain the allegation of a bill for rescission that complainant was induced by fraudulent misrepresentation and suppression of facts by defendant and its officers to enter into a contract for the purchase of a large pulpmill and water power in Canada, together with certain concessions or leases from the provincial government giving defendant the right to cut pulp wood from crown lands, but, on the contrary, to show that at the time the contract was

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ratified by defendant's stockholders and complainant accepted and made a payment on the same he had full knowledge of all the facts affecting defendant's property and title, which made the contract binding upon him.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 69–76; Dec. Dig. § 44.*]

2. CANCELLATION OF INSTRUMENTS (§ 57*)—RELIEF—RECOVERY OF PAYMENT—STIPULATION FOR FORFEITURE AS LIQUIDATED DAMAGES.

Complainant entered into a contract for the purchase from defendant of manufacturing property and water power for the price of $2,150,000, on which he made a payment of $100,000. The contract provided that, in case of default in further payments, it should terminate, and the sum paid be forfeited to defendant as ascertained and liquidated damages. Complainant made default, and was notified by defendant to perform by a time stated or the contract would be terminated. He made no request thereafter for further time, nor offer of performance, but repudiated the contract, and brought suit for its rescission on the ground of fraud. *Held*, that on a decision holding the contract valid complainant was not entitled to be relieved in equity from the provision for retention of the payment by defendant as liquidated damages.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 114–118; Dec. Dig. § 57.*]

In Equity. Suit by Edward Ames Edmonds against the Spanish River Pulp & Paper Company, Limited. Decree for defendant.

The complainant filed his bill in the circuit court for Outagamie county, Wis., the same having been removed to this court, wherein he alleges:

First. That on April 20, 1907, the parties to the suit entered into an agreement, the complainant being induced to enter into said agreement in reliance upon the truth of certain material representations made by the defendant, and but for which he would not have entered into the same.

Second. That on the date mentioned the defendant represented that it had acquired certain interests, rights, privileges, and advantages from the government of the province of Ontario, Canada, referred to in said agreement as a concession or agreement, dated September 21, 1899, and a supplemental agreement dated December 1, 1904, both of which were in writing, copies thereof being attached to the bill.

Third. That the complainant, before entering into the agreement, had visited and inspected the defendant's pulpmill at Espanda and the water power there situated, whereby said mill is operated and upon which it is dependent for power. That the defendant's officers and agents falsely represented that the defendant was the owner in fee absolute of a large part of lot 8 (hereinafter referred to, but upon which defendant's mill and power was alleged to be situate), and of that part thereof through which flows the Spanish river, whereon was created and maintained by means of a dam built across said river the water power mentioned and described in the agreement between the parties to the suit. That the defendant falsely and fraudulently represented to the complainant that it had the absolute right to maintain in perpetuity the water power as and of the height then maintained, to wit, of about 60-foot head or flow, and that it had acquired and would transfer to the complainant title of the land overflowed by the maintenance of said dam, when, in truth and in fact, the defendant had acquired title to but a part of the lands so overflowed, and had no title or privilege to a large portion of the land so overflowed, except a license or privilege from the government of Ontario. That said license or privilege was for but a short period of time, to wit, 13 years, and was granted to the defendant upon consideration of an annual fee or rental. That the defendant fraudulently concealed from the complainant the fact that any of the lands so overflowed were being thus overflowed by virtue of license or permit from said government, or otherwise than by virtue of the defendant's right as owner in fee.

Fourth. That at some time after entering into the agreement, and prior to July 11, 1907, when such agreement was by the shareholders of the defendant ratified, the complainant was informed, as the fact is, that there is grave doubt as to the validity of the defendant's title, if any it has, to the water power and bed of the stream of the said Spanish river, whereon is constructed and maintained the water power mentioned in the agreement. That said water power and the right to maintain it for all time, subject to no controversy or adverse claim of title, was a principal inducement to the complainant to enter into said agreement, and but for it the complainant would not have so entered into the same. That being informed of the doubt as to the validity of the defendant's title and ownership of the water power, and of its want of authority and right to maintain said water power as then existing and maintained, the complainant immediately raised the question with defendant's officers and agents, and advised said officers and agents that plaintiff would recede from said then unratified agreement, if defendant's title and ownership of the said water power and the bed of the stream whereon said water power was located was less than the absolute and unquestioned fee simple title and ownership. That thereupon defendant expressly, falsely, and fraudulently represented and guaranteed to the complainant that it had unquestioned, perfect title in fee simple to said water power and the bed of said river whereon the same is situated, and falsely and fraudulently represented that the government of Ontario, the then owner in fee of said title, if defendant was not such owner, then did and would make no claim whatsoever to the title and ownership of said water power and bed of said stream whereupon said power was constructed and is maintained. That defendant's officers and agents further represented that it would guarantee to make said title perfectly satisfactory to complainant, in lieu of which it would not hold the complainant to their said agreement, but would return to the complainant the $100,000 then on deposit in trust to be paid to defendant upon their ratification of said agreement. That thereupon, relying upon said false promise and false representations, complainant thereafter, on July 11, 1907, permitted and assented to the payment to the defendant of the said $100,000.

Fifth. That, after the ratification of the agreement and the payment of the $100,000 to the defendant, complainant learned that the government of the province of Ontario had at all times, then did, and now does, assert a claim to own in fee simple absolute the title and ownership to said water power and the bed of the Spanish river whereon said water power was constructed and is now maintained, and that said government claims never to have parted with said title or ownership. That, after repeated attempts by the defendant's officers and agents to secure some assurance from said government that it did and would make no claim to the said title and ownership, defendant failed to secure such assurance or any concession equivalent thereto, and wholly failed to secure for complainant satisfactory title to the bed of said stream and the water power mentioned and agreed to be conveyed.

Sixth. That although defendant's pulpmill referred to had been completed about two years prior to April 20, 1907, the defendant had taken no steps to erect the paper mill as provided in the concession agreement referred to. That it would appear that by reason of such failure defendant had incurred and was subject to forfeiture of all of its rights under such concession agreement, whereupon complainant inquired of defendant's officers and agents while negotiating the agreement whether said government had waived its rights to insist upon such default and forfeiture, and the defendant's officers and agents falsely and fraudulently stated and represented to the complainant that it, said government, had so waived its right to so insist upon said forfeiture, when in truth and in fact it had not done so. That complainant did not learn of the attitude of said government until some time subsequent to the ratification of said agreement and the payment of said $100,000, when he learned, as the fact is, that said government had not waived its said rights to insist upon forfeiture, and it refused to give the complainant any assurance that it would not insist upon such rights of forfeiture under such concession agreements, and that but for said false and fraudulent representa-

tións to' the effect thàt said government had waived said default the complainant would not have entered into said agreement.

Seventh. That the defendant falsely and fraudulently represented to the complainant before it entered into said agreement that it had on hand ready for use $20,000 of pulp wood in excess of what it had in fact had or possessed. That it also fraudulently and falsely represented that it had during negotiations added to this stock of the value of $10,000, wherefore the consideration of the contract was increased by $10,000, but for which false representations complainant would not have agreed to pay the consideration fixed therein.

Eighth. That among the assets of the defendant which it agreed to sell and transfer to the complainant by the agreement are a large number of so-called trade contracts, made for delivery of large quantities of pulp to mill proprietors in other states, which contracts were supposed to be, and were if valid and enforceable, valuable assets, and the same constituted a principal inducement to complainant for entering into said agreement. Such contracts are believed to aggregate $400,000, but are null and void for the reason that the defendant failed and neglected to comply with the laws of said several states respecting conditions to be complied with by foreign corporations doing business therein. That the complainant was unaware of such invalidity, or of the facts out of which the same arose, and that such facts were falsely and fraudulently suppressed and concealed from the complainant, and such contracts were falsely and fraudulently represented as being of great value.

Ninth. That the so-called concession agreements are too vague, uncertain, and indefinite to be specifically enforced, or to furnish a basis for damages, and are lacking in mutuality, and are void. That complainant's agreement with the defendant as to the interest in said property and the extent conveyed thereof is uncertain and incapable of being ascertained and determined, and the consideration for such agreement has in great part failed.

Tenth. That, after the discovery of the false and fraudulent representations, facts, things, and circumstances, above recited, the complainant refused to further perform or recognize said agreement as binding upon him, and refused to make the payment therein required to be made upon the first day of January, 1908, and that thereafter, to wit, on January 20, 1908, the defendant caused to be served upon the complainant a notice, in substance, to the effect that the defendant required the complainant on or before February 15, 1908, to perform all the terms and conditions of the contract referred to. That time is made of the essence of such contract and such notice, and that in default of complainant fulfilling the terms and conditions thereof the defendant will forfeit and take to its own use the $100,000 paid by the complainant, declare the contract terminated, and will claim further and other damages, etc. Such notice was dated January 10, 1908.

Eleventh. The defendant did on or about February 15th wrongfully declare the said $100,000 paid on said contract forfeited to the use and benefit of the defendant, and now refuses the return thereof to the complainant, and denies his right thereto. The complainant has had no profit, benefit, advantage, or interest result from said alleged contract with the defendant.

The prayer is for judgment "rescinding the said agreement between the complainant and defendant, and for the recovery of the sum of $100,000 together with interest thereon at 6 per cent. since the 11th day of July, 1908, and for the costs and disbursements of this action, and for such other and further relief as may be equitable and just."

The defendant answers as follows:

First. The execution of the contract of April 20, 1907, is admitted.

Second. Denies the making of any of the false and fraudulent representations set forth in the complaint, or any false or fraudulent representations whatsoever, with respect to any of the property rights or interests involved in said contract, or with respect to any matter connected with or affecting the same, and likewise denies that any of its officers or agents made to the complainant at the time of the execution of the contract, or at any other time, any guaranty, warranty, representation or assurance, other than is embodied in the contract; but, on the contrary, alleges that such contract thoroughly and fully expresses the entire agreement of the parties.

Third. Admits that on or about the 11th day of July, 1907, complainant paid to defendant the sum of $100,000 "in pursuance of the terms of said contract." That at all times, and up to and including the 15th day of February, 1908, it has been ready, willing, and able to carry out the contract according to its terms, and to convey to the complainant all of the property specified therein, but that the complainant has omitted and refused to carry out the same on his part. That both prior to and after the making of said contract complainant visited the property and plant embraced therein, and personally examined into the condition of said property, and made inquiry and investigation, not only of the physical property, but also of the character of the rights and titles included in the contract, and was fully advised and informed by the defendant in the premises, and not only so, but in the execution of said contract was given by the defendant the personal supervision and direction of the property and plant agreed to be purchased by him, subject to the control of the defendant, and familiarized himself with the details of the business, and continued in the direction thereof until about the 16th day of December, 1907, and long after he had become acquainted with all the facts in his possession at the present time.

Fourth. Admits the execution of the concession agreements, and the correctness of the copies thereof attached to the bill, and alleges that the original agreements were exhibited to the complainant prior to entering into the contract with the defendant as defining the measure and extent of such concessions and of the defendant's rights thereunder.

Fifth. Alleges that at the time of the making of the agreement with the complainant it was, and since has been, and is, the owner of a large part of lot 8, described in said agreement, and of that part thereof through which flows the Spanish river, and that the water power referred to in the agreement between the parties was created and maintained by means of a dam built across said river. Denies that it represented that it had any other rights to maintain said dam except such as arose from its title as riparian owner on both sides of said river, and under certain rights of flowage of land by reason of said dam, including the right mentioned in the second clause, paragraph fourth of the complaint, to wit, a license from the government of Ontario, and that all the facts in relation to such flowage rights were thoroughly and correctly stated to said complainant at and before the making of the agreement between the parties.

Sixth. Denies that there is doubt as to the validity of defendant's title to the water power, or to any of the other property agreed to be conveyed, or that there is any valid adverse claim of title to the same on the part of any person or corporation whatsoever; but that it has and had a good title to all of the property which, under the terms of said contract, it had agreed to convey to complainant, including the rights of flowage referred to.

Seventh. Alleges that it is true that it has not yet erected the paper mill referred to in the concession agreement, but that, according to the terms of the latter, the time within which said mill is required to be erected will not expire until December 1, 1909, and that the complainant fully understood the terms of such concession agreements and entered into the agreement with defendant fully apprised of, and consented to, the same, well knowing that at such time no paper mill had been erected under such concessions.

Eighth. Alleges that no false or fraudulent or other representations were made by the defendant to the complainant, as to the amount of pulp wood on hand; that such amount was investigated, examined, and estimated by both parties; that the facts were within their equal information, opportunity to investigate, and means of knowledge.

Ninth. The defendant further alleges that the complainant was fully informed as to the nature of the trade contracts referred to in the bill, and of the fact that the defendant had not undertaken to comply with the laws of the several states; further, that all of such contracts covered transactions constituting interstate commerce, all valid and enforceable notwithstanding the omission of the defendant to qualify under the foreign corporation laws of the several states; that said contracts did, in fact, constitute valuable assets in the hands of the defendant, and have been substantially carried out, the pulp delivered, and the purchase price paid therefor; that

by reason of the facts alleged the forfeiture clause of the contract became operative.

On September 29, 1899, the province of Ontario granted to individuals, predecessors of the defendant company, a concession, the terms of which are:

The company (predecessors of the defendant) is the owner of lot No. 8 in the sixth concession of the township of Merritt, through which flows the Spanish river, which at a certain point therein "has formed a very valuable water power, which the company intends to utilize for the purpose hereinafter set forth. It proposes to construct and operate upon such lot and in connection with the water power, extensive pulp and paper mills, and to expend a large amount of capital in connection therewith and with the operation thereof, and from time to time to extend the same, and is therefore desirous of obtaining from the government the right to cut from and upon certain crown lands, pulp and other woods necessary to carry on the enterprises. This agreement is entered into for the purpose of insuring the performance of its obligations herein contained," and of securing to the company a continuous supply of wood for the purpose of its business, and upon the terms and subject to the conditions and stipulations specified; it being further contemplated that the company (the parties of the second part to said agreement) propose forming a joint-stock company for the purpose of acquiring the land previously referred to (lot 8), assuming the concession agreement, both as to benefits and obligations, and of carrying on and operating the undertaking referred to as follows:

(a) The parties of the second part shall form a joint-stock company, and shall immediately convey the land described, together with the concession agreement and all benefit and advantage to be derived therefrom to such company. The latter shall assume their liabilities under the concession agreement, etc.

(b) Such company shall proceed with the erection, construction, and equipment of a pulpmill on the land in connection with the water power, expending therefor at least $500,000, and will operate the same as specified.

(c) In consideration of the expenditure and of the contracts and engagements thus entered into, the government grants to the company, for use in said business, the right, for a period of 21 years from the date thereof, to cut and remove wood at the localities particularly therein specified. The company, however, may select and delimit or set out 50 square miles of unoccupied and unlicensed public lands from the territory, but under the restrictions specified; and the government will from time to time grant permits to cut elsewhere within the territory than on the 50 miles under the restrictions specified. The price per cord is fixed; the right to revoke the license or permit in case of default in compliance with its terms is reserved; only the right to cut is sold under the concession, and not the soil or any part thereof nor any interest therein, except so far as may be necessary to cut and remove the wood. There are other specifications not pertinent to the questions presented in the case. Such concession agreement is signed and entered into provisionally by the commissioner of crown lands, but subsequently became absolute through approval by resolution of the legislative assembly of the province of Ontario.

On December 1, 1904, a supplemental agreement was entered into which after reciting that, in view of circumstances beyond the control of defendant, the latter having become the assignee of the concession agreement as originally contemplated, and delay having been occasioned in the compliance with the terms of the previous agreement respecting the development of the water power, the construction of the pulpmill, etc., by reason of which it has been unable to reap any of the benefits of such concession agreement, stipulated as follows:

(1) That the company had expended under and within the terms of such original agreement $500,000, and had complied therewith up to the present time; that it shall urge a prosecution of the work upon said dam, and shall do everything in its power to insure the completion thereof and operation of said pulpmill within the time contemplated. And immediately after the pulpmill has been put into operation it will commence the erection of a

paper mill, complete and equip the same so that it shall be in operation within five years from the date of such supplemental agreement at an expenditure of at least $250,000 in addition to the expenditures provided for in the principal or original agreement. In consideration thereof, the right to cut and remove woods as provided in the original agreement is declared to be 21 years from the date of the supplemental agreement, provided that in all respects the company shall comply with the covenants of the principal agreement respecting the manufacture, annual output, and amount of wage labor to be employed in said mills.

The company so long as it shall proceed with convenient dispatch with the development of said water power and the completion of the pulpmill, shall not be deemed in default under the said principal agreement in respect to its covenant to erect and operate the mills.

On March 27, 1902, the province of Ontario granted to the defendant two parcels of land containing 38¼ and 37 acres, respectively, described by metes and bounds, which in the case have been referred to as flowage lands; the purpose of the grant being to secure to the defendant for the time therein limited "the right to pen or dam back the water of the Vermillion and Spanish rivers to such a height as will give a head of 60 feet at the mills of the said lessees on lot No. 8 in the sixth concession of the township of Merritt and no further, notwithstanding that such penning or damming back of the waters of said river may affect the falls of the Spanish river on lot 12 in the sixth concession of the township of Foster, or the falls on the Vermillion river on lot 10 in the fifth concession of the said township." Such grant, which is designated as a lease, was for a term of 21 years from April 1, 1902.

The defendant was thus possessed of the following lands, property, and appurtenant rights:

(1) Its mill and water power property situate on lot numbered 8 in the sixth concession of the township of Merritt, with other lands owned in fee, aggregating approximately 2,000 acres. There is no controversy in the case respecting these, excepting the water power claimed to be appurtenant to the land through which the Spanish river flows.

(2) The two parcels of so-called leased lands acquired under the provincial lease dated March 27, 1902.

(3) The rights acquired under the concession agreement dated September 21, 1899, and the supplemental agreement dated December 1, 1904.

(4) Personal property.

The facts are further detailed in the opinion.

C. G. Cannon, of Appleton, Wis., P. H. Martin, of Green Bay, Wis., and Miller, Mack & Fairchild, of Milwaukee, Wis., for complainant.

Quarles, Spence & Quarles, of Milwaukee, Wis., and Leighton McCarthy, of Toronto, Canada, for defendant.

GEIGER, District Judge (after stating the facts as above). [1] Upon the trial the complainant urged his right to relief upon three grounds:

First. That the defendant had falsely and fraudulently misrepresented to him its title and ownership of the water power appurtenant to its mill property—in substance, that it represented absolute ownership, when in truth and in fact it did not own it, but that the title to said water power rested in the provincial government of Ontario.

Second. That the defendant falsely and fraudulently represented that it had the right to flow or flood the lands covered by the provincial lease dated March 27, 1902, and thereby to maintain its dam to the height of 60 feet, in perpetuity, and suppressed the fact that it had

such flowage privilege for the limited term of 21 years from April 1, 1902.

Third. That the defendant wrongfully declared a forfeiture of the rights of the complainant under the contract of April 20, 1907.

At the conclusion of an exhaustive argument, I expressed the opinion that the complainant had failed utterly to establish his allegations of fraud, fraudulent representations, or concealment. A further examination of the evidence has satisfied me of the correctness of such opinion. While there is conflict between the witnesses on certain points, such conflict is reconcilable with other undisputed facts in the case; so that the application of certain elementary principles of law can be made readily, and to the exclusion of doubt.

The situation of the defendant company being as indicated, the complainant, with Brown and Edmonds, entered into negotiations with the defendant company in the month of November, 1906. These were conducted orally, not evidenced by memorandum other than the following:

"Toronto, December 10, 1906.
"Messrs. The Spanish River Pulp & Paper Co., Orillia, Ont.

"Gentlemen: We agree, subject to being able to finance the proposition by the first of March next, to purchase the entire assets, free from encumbrance, of your property, with the exception of your book accounts and bills receivable, for the sum of $2,150,000, payable in cash on or before the above date, and agree to take over all contracts you have made in connection with the business of the company.                [Signed]    A. W. Brown.
                                                    "E. A. Edmonds.
                                                    "A. D. Daniels.

"We hereby accept the within proposition on behalf of the Spanish River Pulp and Paper Co.        W. J. Shepard.
            "James B. Tudhope, Secretary and Treasurer."

Brown and Daniels assigned their rights under this memorandum to the complainant. They had all visited the plant and property of the defendant, inspected the same, and doubtless talked with the officers of the defendant in a general way respecting the property, the extent of the holdings, and probably the character of the titles. No doubt, the defendant having the concession agreements, having lands in fee, the parties discussed as business men would the subject-matter of the memorandum, with a view of reaching the general conclusion of purchase and sale therein expressed. The deal was not consummated, probably because of the inability of complainant to "finance it," but during the time that it was pending under this memorandum he received a complete list and description of all of defendant's holdings which became the subject-matter of the later contract entered into. He endeavored to interest persons to co-operate with him in carrying out the purchase, and his solicitor had drawn a form of mortgage or trust agreement upon which he proposed to borrow the money for that purpose. Although it was a matter of sharp controversy, there is no doubt but complainant was apprised with reasonable certainty of just what the defendant professed to own. It is urged by the complainant that, when this original memorandum was entered into, he and his two associates, either upon inquiry or upon the volunteer statements of officials of the defendant company, learned that the latter owned the

water power appurtenant to the land upon which the mill is situated, also, the so-called flowage rights. He therefore claims that, although the contemplated purchase under the memorandum of December 10, 1906, was never carried out, the representations made at that time, the information obtained in his negotiations, were not renounced or modified by the defendant company or by any of its officers, but in truth relied upon by him when he personally resumed negotiations with the defendant company's officers, which resulted in the making of the contract herein under date of April 20, 1907, set out at length in the bill. It is immaterial whether negotiations were resumed at the solicitation of the complainant or of the defendant, but it is noteworthy that such formal engagement contains certain provisions, doubtless inserted for the protection of defendant, but respecting whose meaning there can be no doubt.

First. That the defendant company sell to the complainant its pulpmill, "together with all its freehold *and leasehold lands* and water power now owned by the company" as of the 1st day of March, 1907.

Second. That the purchaser (complainant) "acknowledges that he has examined the property of the company and the concession agreement aforesaid and accepts the same and the company's title thereto as it stood on said first day of March, 1907, the company agreeing only to transfer to the purchaser such title as they possess."

Third. That such agreement was subject to approval by the shareholders of the defendant company to be obtained with dispatch, and in case of nonapproval purchaser's cash payment to be returned to him.

Fourth. That in the event the purchaser failed to carry out the agreement and make the payment agreed to be made January 1, 1908, the cash payment of $100,000 shall be forfeited to the company as ascertained and liquidated damages, the agreement terminate with no liability on the part of the defendant to account for the operation of the business and for any profit made therein.

The agreement thus dated April 20, 1907, having been executed at or about the same time, complainant very soon thereafter prepared to carry it out by, among other things, causing examination to be made of the company's titles, and assuming direction of defendant's business pursuant to clause 2 of said contract. The defendant claims to have given to complainant's solicitor full information respecting the titles, delivering him its title deeds and papers, and he proceeded with such work of examination. Within a short time a discussion arose between complainant and defendant through their respective solicitors respecting the one phase of the title of the water power, suppression of the facts whereof is the gravamen of complainant's claim of fraud upon which he bases his right to rescind. The water power in question is found in the Spanish river, where it traverses a tract of land owned by the defendant, which tract it obtained from its predecessors in title, the provincial government having originally granted the land on either side of the stream by one patent. Apparently, by virtue of such grant, the defendant and all its predecessors had assumed and enjoyed unquestioned title to the bed of the stream, and the consequent ownership of the water power created and developed as stated in the case. It appears, however, that in October, 1906, a decision had been ren-

dered by the high court of the province of Ontario, a court of general jurisdiction, in two cases which are referred to in the record as the "Kenora Cases." The decision, in effect, declined to follow what was supposed to be the common-law rule then in force in the province, that, where a grant is made by the government of lands on either side of a stream, the full riparian rights vested in the grantee, that is, that the bed of the stream passed with the grant. It was held that, while at common-law such was the presumption, it was not the law of Ontario respecting streams tributary to the Great Lakes, and hence, unless the terms of the grant from the government, or other attending circumstances, disclosed an intention on the part of the sovereign to relinquish the title to the bed of the stream and the riparian rights, the presumption was against such intention. It may be admitted, as the fact was, that the decision occasioned surprise, and doubtless caused some apprehension respecting the stability of titles to which water power and riparian rights had theretofore been deemed to be appurtenant.

Soon after commencing his work of examination of titles, complainant's solicitor, in a letter to complainant, exhaustively discussed the Kenora decision and its pertinency to the subject-matter of complainant's proposed purchase of the defendant's water power; but, although he apparently advised the making of a requisition on the defendant which would clear the doubt created by such decision whether well or ill founded, he seems to have concurred in the attitude of defendant's solicitors that the doubt was wholly eliminated by the supplemental contract made by the province of Ontario with the defendant in 1904, and the provincial lease of the so-called flood lands made March 27, 1902, both of which give unequivocal recognition to defendant's ownership of the water power, and confer rights which could not be conferred except upon the hypothesis of ownership. Such letter is dated June 13, 1907. The complainant in a letter to his solicitor acknowledging the receipt of the former seems to fully appreciate the subject-matter thereof. The solicitor wrote a similar letter to the president of the defendant company, also its solicitors, making a formal requisition on the latter for a confirmation of defendant's title.

In this situation, the only question between the parties was respecting the applicability of the so-called "Kenora" decision. That it was discussed between the parties is no doubt true; but it is equally true that the defendant and its officers from the inception of negotiations with the complainant in the fall of 1906 at no time represented or claimed the situation to be other than it in fact was, namely, the ownership of the water power by virtue of the ownership of the lands to which it was appurtenant, recognized as such by the government. In other words, the claim was made that, because the defendant owned pursuant to a grant conveying both sides of the stream, it owned the water power. This situation continued until July 11, 1907, on which day there was convened the shareholders' meeting to act upon the ratification of the contract made with complainant. At this time each party recognized fully and precisely the subject-matter of the proposed contract, each conceded the title to the water power to be good, the complainant having suggested the possible doubt, which each regarded as remote, arising out of the "Kenora" decision. It appears without

substantial dispute that on or before the date of such shareholders' meeting the complainant and his solicitors had been and were urging the defendant's officers and solicitors to submit to such shareholders the question respecting the title as affected by the "Kenora" decision, doubtless for the purpose of reserving to the complainant the right to cause the defendant to respond to him in the event that the government should at any time in the future succeed in assailing the title to the water power. This, however, was steadfastly refused; defendant's officers and solicitors insisting that the title was good. They prevailed in their purpose, fully disclosed to the complainant, not to submit the matter of doubt arising out of the "Kenora" decision, and entertained by him, but not by them, to the shareholders in any form whatsoever; and complainant in such situation permitted the contract to go before the shareholders for ratification, which was done, and thereupon the $100,000 which complainant had theretofore placed in escrow with the bank at Toronto, to be turned over upon ratification, was paid to the defendant.

At and prior to this time the complainant had assumed direction of the defendant's business under the terms of such contract, and continued therein until about December 16, 1907. The matter of the doubt respecting the title to the water power received attention in various ways. The defendant's officers, while protesting that the title was good, offered, in order to enable complainant better to promote the scheme for financing his undertaking, to assist him in prosecuting with the commissioner of crown lands of Ontario, an application for a patent or grant confirming the title. It is claimed by the complainant that the government officials, on the strength of the "Kenora" decision, declined to admit full title in the defendant company, but that they expressed a willingness to give a long time lease, provided the government's ultimate title to the bed of the stream were concurrently confirmed. Defendant's officers, however, refused to entertain any such proposition, because by doing so they would give recognition to an infirmity of their title. It does not appear that the defendant or its officers presented any such matters before the government, other than as stated, by way of assisting the complainant.

The testimony shows that, after the ratification of the contract, complainant devoted much of his time toward promoting the ultimate consummation of his contract, by endeavoring to raise the money through mortgage or trust agreements, but that success did not attend his effort. On November 29, 1907, doubtless having represented his inability to raise the funds necessary to make the payments maturing on January 1, 1908, he induced the defendant to agree to a modification of the terms of the original contract, whereby the deferred payment, instead of being in cash to the amount specified in the contract, was to be covered by a large amount of second-mortgage bonds to be taken in lieu thereof, and the cash balance was in other respects modified as to terms. Such proposed modifying agreement was in writing, and in all other respects expressly ratified the original agreement. It was mailed to complainant, who, on December 7, 1907, acknowledging receipt, wrote to one of the defendant's officers:

"I feel that it is not wise for me to accept the agreement sent me as it is worded, and this makes it necessary for me to endeavor to arrange with you some other method of extension of the present agreement. I hope this can be done without delay and to our mutual advantage."

Accordingly, on or about December 21, 1907, after a conference, in which complainant, defendant, and their respective solicitors participated, a further and different proposed extension agreement, reduced to writing, was left with complainant for signature and acceptance; this also in express ratification of the first agreement, particularly with reference to the property to be conveyed, provided for a modification of the time of performance, the terms of payment of the cash balance increasing by a very considerable amount the deferred payments to be accepted by the defendant secured by second mortgage on the property. Doubtless the parties agreed upon the terms, but without any explanation discoverable in the record, complainant, having this assurance from defendant thus to modify the agreement, suddenly terminated all further connection with the management of the business, and on January 1, 1909, failed to respond in any way to the terms of the original contract, or to enter into the proposed modified contract, assented to as stated. Thereupon, on or about January 10, 1908, the defendant served him with a notice requiring that he meet the terms of the contract of April 20, 1907, by February 15, 1908, in default of which his rights thereunder would be declared forfeited; doubtless intending thereby to assert its rights under clause 7 of such original contract.

It is to be noted that during all this time complainant not once claimed or suggested to the defendant or its officers that it or they had been guilty in any manner of misrepresentation or suppression of facts. On the contrary, as hereinafter noted, he maintained the attitude of performance, doubtless requesting and receiving defendant's agreement to modify the terms of payment to enable him to meet the stress of financial situation in which he found himself, or expected to find himself January 1, 1908. No response was made by the complainant to the demand for performance served upon him, but immediately thereafter, and on or about January 16, 1908, complainant's solicitor addressed a letter to defendant's solicitors inquiring whether the defendant would be able to convey a fee-simple title to the water power on February 15th, as stated in the notice theretofore served. To this defendant's solicitor replied that it would be ready on the day mentioned, as it always had been, to comply with all the terms of the contract entered into April 20, 1907. In the meantime, however, and during the months of December and January, as late as January 31, 1908, complainant, although having ignored defendant's assurances that it would accede to his request for a modification of the terms of payment, was nevertheless in communication with various persons interested in the paper and pulp business, soliciting and importuning them to become associated with him in his venture, and giving in detail estimates of the advantages of the same. It may be noted that in these communications, written when he was in actual default (except for the period of grace given him by defendant's notice), he represent-

ed to third persons that his then existing rights under the contract were in fact such as they *would have been* and *as it was sought to confer* upon him by the extension agreement which he had ignored and refused to sign. No request was made of defendant for further time, no intimation that, because of the financial situation, further indulgence should be granted him; but, on the contrary, the defendant was wholly ignored, excepting by the letter of complainant's solicitor above referred to. It further appears that on January 22, 1908, the so-called "Kenora" decision was reversed by the appellate judicial tribunal of Canada, and that the complainant learned thereof within a day or two.

In May, 1908, without further intercourse between complainant and defendant, this suit was started, the bill in which, apparently for the first time, conveyed to the defendant any claim of fraud or suppression of facts respecting the subject-matter of the contract. Granting that there is a possibility of spelling out of the evidence in the case a failure on the part of the defendant's officers originally to disclose the precise situation respecting its title to the water power because it failed to communicate to the complainant the doubt growing out of the "Kenora" decision, the material and conclusive fact against the complainant is that long before the contract had become operative he was fully apprised of the situation. The contract did not become operative, so far as he was concerned, because of his reliance upon the nonexistence of a situation such as he now claims was credited by the "Kenora" decision. Knowing and appreciating it fully, and knowing that the proposed contract was tentatively entered into, with the disclaimer on the part of the officers of the defendant company of authority to enable its execution by them on the defendant's behalf, it seems to me absurd for the complainant now to assert that whatever representations were made by such officers prior to ratification should be imputed to the defendant when, to the knowledge of complainant, the ratified contract was intended to be and is repugnant to such representations. It seems idle to contend that the defendant's officers, disclaiming authority to bind the defendant to the written stipulations of the contract which provide for a conveyance merely of the defendant's interest, could still bind it by their oral representations that such written provisions would not be insisted upon after ratification. Complainant has indicated in no way the possibility of removing this incongruity, and it seems to me to be conclusive against his contentions of suppression, misrepresentation, or overreaching. He was precisely informed respecting the situation as it went to the shareholders of the defendant company, and by his own acquiescence foreclosed complaint against the terms of the contract.

With respect to complainant's second contention, that the defendant concealed the fact that certain of the so-called flowage rights were held only under a lease, it is urged that not only was the fact of such lease suppressed, but also the fact that through such lease, for a limited period, the company was enabled to maintain its dam at a greater height than without such lease, and hence the maintenance of the dam at a 60-foot head was dependent very substantially upon a mere leasehold.

The facts are in my judgment as clear and free from doubt as are those respecting the title to the water power dependent upon ownership of the bed of the stream. After complainant and his associates Brown and Daniels entered into the memorandum of December, 1906, and particularly during the month of January, 1907, complainant's solicitor, although disclaiming making an examination of titles, was put in possession, as defendant insists, of all the title papers of the latter company. It was sharply disputed in the case whether such solicitor obtained knowledge of the so-called lease of flowage rights until the day after the meeting of shareholders in July, 1908. I am satisfied that he learned of the state of all the defendant's titles as early as January, 1907. In the latter month complainant, in his endeavors to finance the deal, had opened negotiations with third parties looking to the execution of a trust deed or mortgage to raise the requisite funds to carry it out. His solicitor at that time prepared a proposed trust deed which contained accurate descriptions of all of the lands of the defendant company which it was then contemplated should be transferred under date of March 1, 1907. The description and phraseology respecting titles therein are identical with the language of title papers testified to have been given complainant's solicitor in January, 1907, and, under the system of registration of titles, such description as pertained to mortgages of water-power lands could have been obtained from no source excepting from papers in the possession of defendant's solicitor and claimed to have been given to complainant's solicitor. In a letter addressed to complainant under date of June 13, 1907— a month prior to the ratification of the contract—in discussing defendant's claims respecting title to ownership of the water power because it owned both sides of the stream, that the province of Ontario by supplemental agreement and lease, had fully recognized such ownership, the solicitor states:

"The company (defendant) found on examination of engineers, etc., that they required to build a dam to increase the power at the falls, and in order to do so would have to flood certain lands further up the river, and in fact it has affected certain falls on the Vermillion river claimed by the Manitoulin & North Shore Railway. The government in dealing with that matter felt that in order for the undertaking to be carried out by the present company (defendant) these grants and right to flow lands further up the river should be granted, and although there was opposition to that by parties interested, the government granted these privileges to the present company, thus showing that at all times they treated this water power as belonging to the present company, and that the present company should be protected and encouraged in their undertakings."

In the mortgage prepared by the complainant's solicitor in January, 1907, the lands thus referred to in his letter are described by him in the language contained in the former mortgage made by the defendant company, and particularly *as a lease, giving the right to pen up and dam back the waters,* notwithstanding that it might affect the Vermillion Falls. In a letter written by him to defendant's solicitors under date of July 18, 1907—and which would be six days after July 12th, when it was claimed he for the first time learned of the existence of the so-called lease, he says:

"In reference to the lease with the crown of the lands in the township of Foster, or the right to dam or pen back the river giving the company a head of 60' at their mills, we may say that we examined this crown lease in your office some time ago and in writing Mr. Shepard and Mr. Tudhope in reference to the defect in title, we pointed out to them that we considered the rights given in that lease to be the strongest claim which the company had the government to force them to give absolute title as in that lease they have practically recognized the company's title to the water power."

The testimony shows that the correspondence with Shepard and Tudhope, last before referred to, was approximately at the date of the complainant's solicitor's letter dated June 13, 1907.

It was not until January 18, 1908, and after defendant had served a notice on complainant requiring him to perform his contract, that any intimation or claim was ever made of suppression of knowledge of defendant's actual rights under this so-called lease or the existence thereof. The letters written by complainant's solicitor to defendant's solicitor under date of December 14th and January 18th, wherein it is assumed, apparently without foundation, that the defendant was proceeding in the discharge of some obligation to perfect titles, are strongly at variance with the complainant's own silence toward the defendant and with his letters to third parties seeking their co-operation and interest in promoting the venture. I think his contention is clearly an afterthought, and there is no testimony whatever to support it, much less to overcome the positive provisions of the contract requiring him to purchase the interest of the defendant company as it stood on March 1, 1907.

[2] Complainant's third contention, in substance, is that, the defendant being guilty of an attempted wrongful forfeiture, he thereby has the right to rescind the contract and to have the payment made by him restored. It is urged that the $100,000, which the complainant paid, should be treated as security, and hence, although the contract provided that the amount could be retained as ascertained and liquidated damages, a court of equity should relieve as against a forfeiture, and limit the defendant to actual damages. But the amount paid by the plaintiff was not security—it was a part payment on the contract to purchase the defendant's property—and the mere fact that the defendant notified him after he was in default that, unless he would perform within a stated time, it would treat the contract as at an end, did not transform the payment of $100,000 into anything else. It was an escrow, and became an actual, part payment for the use of the defendant, upon ratification of the contract; and the pleadings, complainant's testimony, his correspondence with third parties whom he importuned to assist in promoting the venture, treat it as such and nothing else. That the loss of $100,000 is burdensome to the complainant may be conceded; that the defendant's right to retain it is unconscionable is an entirely different question. We know of no rule in the construction or enforcement of ordinary contracts of sale which gives to the vendee the right to recover payments made by him whenever he is in default and the vendor seeks to enforce the contract, either by insisting upon its terms, or by proceedings to foreclose. The complainant here did not seek to be relieved from the terms of the

contract and to have the defendant's damages assessed. He did not seek the aid of a court of equity to enable performance after he was in default. Even after he had defaulted, and after defendant demanded that he perform, he took the position with third persons of asserting his rights under the contract as though he were not in default. But, when he finally failed in his efforts to finance the deal, he severed all relations with the defendant, and some months later instituted this suit, seeking to rescind the entire contract upon the ground of a fraud, which on the face of the bill was none other than a deliberate deceit and suppression of facts. He was not in a position, not having offered to perform or to do equity, to face about when he found that the facts did not substantiate his bill, and to complain because the defendant adopted the course which his own conduct compelled it to adopt. He has urged that the defendant, although offering to perform, could not perform because the title to the water power still remained defective —the so-called lease being nonassignable—without the assent of the province. He did not, however, on that ground, refuse to perform. He did not demand performance, but, on the contrary, ignored defendant's offer to perform. In any event, there is nothing to show that defendant was not able and willing at the time fixed to perform fully the contract which it had made with complainant.

A decree may be entered dismissing the bill.