Argued September 8, affirmed November 28, 1916.
Modified and affirmed on rehearing July 31, mandate recalled and corrected as to costs September 19, 1917.

## STENNICK *v.* J. K. LUMBER CO.

(161 Pac. 97; 166 Pac. 951.)

**Logs and Logging—Sales of Timber—Rescission—Evidence.**

1. In a suit to rescind a contract for the sale of timber, evidence *held* insufficient to show that defendants intentionally misrepresented the amount of timber on the tracts involved.

**Logs and Logging—Sale of Timber—Misrepresentations—Effect of Writing.**

2. That an alleged misrepresentation as to the quantity of timber involved in a contract was written into the contract does not add to its efficacy or make it fraudulent.

**Contracts—Rescission—Fraud—Evidence.**

3. Where it is sought to set aside a contract for fraud, the evidence should be clear and satisfactory; it being a maxim of law that fraud is never presumed.

[As to burden of proving fairness of transaction, see note in **Ann. Cas.** 1912A, 704.]

Logs and Logging—Sales of Timber—Validity of Contract—Fraud.

4. In order to have a rescission of a sale of timber for fraud, plaintiff must show that defendants made a material representation; that it was false; that when they made it they either knew it was false or made it recklessly without knowledge of its truth, as a positive assertion; that it was made with intent that it should be acted upon by the opposite party; that such party did act in reliance upon it and suffered injury.

Logs and Logging—Sales of Timber—Rescission of Contract—Evidence.

5. In a suit to rescind a sale of timber, evidence *held* to show that representations made by defendants as to the quantity of timber were in fact false.

Logs and Logging—Sales of Timber—Rescission of Contract—Evidence.

6. In a suit to set aside a sale of timber for fraud, evidence *held* insufficient to show that defendants promised the other contracting party a quarter interest in a corporation to be formed.

Appeal and Error—Review—Scope and Extent—Misjoinder of Causes.

7. Where no demurrer for misjoinder of causes was interposed, and a motion to compel plaintiff to elect·between causes was withdrawn or overruled by consent, the Supreme Court will, notwithstanding the contention that a cause of action for rescission and one to set aside a declaration of forfeiture cannot be joined, consider both causes on the merits.

Contracts—Construction—Forfeiture.

8. Courts are reluctant to enforce a forfeiture, and no language will be construed to work one where a contrary intent can be derived from a consideration of the whole instrument or from the circumstances attending its execution.

Contracts—"Forfeiture"—"Penalty"—Distinction.

9. In contracts and in civil matters generally the term "penalty" imports a clause by which the obligor agrees to pay a certain sum of money if he shall fail to fulfill the contract; while "forfeiture" is a broader term, including not only the payment of money, but the loss of property or of some right by reason of failure or neglect of a party to perform a contract.

Logs and Logging—Contracts—Forfeiture—Enforcement.

10. Where a contract relating to timber provides that in case of default by one of the parties his property and interest in the contract shall forthwith become the property of defendants who hold the legal title to the land, if the language of the agreement shows an intent of the parties to prescribe a forfeiture, and there has been a default, unless it is occasioned by the inequitable conduct of the defendants, the forfeiture must be enforced.

Contracts—Performance—Forfeiture for Breach.

11. Declaring a forfeiture for breach of conditions of a contract is not a rescission of the contract, but the assertion of a right growing out of it.

ON REHEARING.

**Appeal ana Error—Harmless Error—Ruling on Demurrer.**

12. Error in overruling a demurrer for misjoinder of causes was harmless; the case having proceeded as a suit on one of them only.

NOTE.—Mandate recalled and corrected September 19, 1917, so that neither party recover costs.        REPORTER.

From Multnomah: JOHN P. KAVANAUGH, Judge.

In Banc.    Statement by MR. JUSTICE MCBRIDE.

This is a suit to rescind a contract for the sale of timber, situated in the State of Washington, on the ground of fraudulent representations as to the quantity of such timber and other alleged false representations materially affecting the contract. The pleadings independent of the exhibits would occupy 130 pages of the Oregon Reports, and the testimony taken on the trial contains over 3,000 pages of typewritten legal cap. The following excerpt from the opinion of the learned circuit judge who tried the case below indicates in a condensed form the various transactions between the parties up to the time this suit was begun:

"For some time before January 27, 1913, E. H. Dodge, Percy Allen, Fred A. Kribs, W. N. Jones, and F. A. Brewer, conferred and negotiated concerning the bonding of timber interests in Skamania County, Washington, and the logging and manufacture of timber. Fred A. Kribs was interested with the Pillsburys of Minnesota, in a large tract of timber in that section. The Pillsburys owned a three-quarter interest, and Kribs a quarter interest therein. W. N. Jones had a small tract of timber in that locality, and E. H. Dodge was the owner of a considerable tract of timber adjacent to the Pillsbury and Kribs tract. F. A. Brewer was a broker of Chicago, and was engaged in promoting the bonding of timber lands. As a result of those negotiations it was agreed that the timber lands owned by F. A. Kribs and Pillsburys, E. H. Dodge, and W. N. Jones should be transferred to a holding company and bonded in the sum of $900,000, and under an agreement

for the logging and manufacture of the timber Kribs and Jones organized and incorporated a holding company known as the J. K. Lumber Company, and on January 27, 1913, the said J. K. Lumber Company, the Hamilton Creek Timber Company, the Rainier Lumber & Shingle Company, and E. H. Dodge entered into a contract in writing to effectuate this enterprise. By this contract it was agreed, among other things, that the J. K. Lumber Company had or would acquire title to about 8,000 acres of timber land in townships 2 and 3 north, range 7 east, in Skamania County, Washington, on which there was 441,609,000 feet of timber; and that it would use its best endeavors forthwith to acquire title to approximately 75,000,000 feet of additional timber in township 3 north 7 east, in said county, that might be agreed upon by the parties to the contract. It was further agreed that it would mortgage the property covered by the contract as security for an issue of bonds in the sum of $900,000. Said holding company agreed that it would use and apply out of the proceeds of said bonds such sums as might be necessary, not exceeding $215,000, to construct two railroads, one up Hamilton Creek to about the center of section 36, the other up Rock Creek about two miles from a connection with the S. P. & S. railroad; to construct and equip a sawmill on section 35, with an annual capacity of 20,000,000 feet of lumber; to purchase railroad equipment for both roads, and to construct and equip logging camps sufficient to handle 300,000 feet of logs per day. The construction and equipment on Hamilton Creek were to be completed within six months after the fund of $215,000 was available, and the construction and equipment on Rock Creek were to be completed within one year after the completion of the construction on Hamilton Creek. Said holding company agreed to pay over moneys from time to time as they should be needed for construction and equipment, out of the proceeds of the sale of the said bonds, upon receipt of bills therefor and certified accounts of expenditures verified and certified to be correct by the president or treasurer of the Rainier Lumber & Shingle Company. Dodge and his

corporations agreed to repay to the holding company the difference between $155,000, the price paid for the Dodge timber, and the amount actually expended as above provided, in ten equal annual payments, with interest at six per cent per annum. The holding company agreed to sell, and Dodge and his corporations to buy, 658,895,000 feet of timber located on the land then owned or to be acquired by the holding company, at the total agreed price of $1,383,679.50, with interest from January 1, 1913, at the price of $2.10 per thousand for the year 1913, and increasing 6 per cent each year thereafter. The payments were to be made to the trustees under the trust deed until the bonds were paid, and thereafter to the holding company. Dodge and his corporations agreed to cut not less than 50,000,000 feet during each calendar year, or failing in this to pay to the amount of 50,000,000 feet. Dodge and his corporations agreed that any money derived from the logging and manufacturing of timber after the stumpage price had been paid, should be used: (1) To provide a working capital; (2) for the extension of logging roads and purchase of equipment, together with other equipment to replace such as would be worn out or destroyed; (3) to make annual payments on the difference in the cost of construction aforesaid, and the price paid by the holding company for the 93,400,000 feet of timber purchased from Dodge; and (4) that the money should be paid in advance, to the holding company to be applied by said company in the redemption and retirement of the bonds; and it was agreed that all profits derived from the operation of said timber should be devoted to said purpose, and that no money derived from the logging and manufacturing of said timber should be used for any other purpose. A checking and settlement was to be made on the 15th day of December of each year. Dodge and his corporations agreed that so far as practicable they would first cut the burned timber on Rock Creek in preference to the green timber, and they agreed that in the event of their failure to fully comply with all the terms, conditions, and provisions of said agreement, the mill property of the Rainier Lumber & Shingle Company, at Rainier, Oregon, the mill situated

on said section 35, and all of the railroad equipment, sawmill and logging equipment purchased for the logging of said timber, either with funds of the holding company, or with funds of Dodge and his corporations, should forthwith become the property of the holding company, and might be used by it for the logging and manufacture of the said timber or any other timber; and they agreed forthwith in case of such default to transfer and convey all of such mill property by good and sufficient deeds of conveyance, and thereby authorized the holding company, in case of such default, to take possession of said mill property and equipment and use and employ the same. Both parties to said agreement agreed to guarantee each of the bonds to be issued, and to endorse such guarantee on each bond. On the same day, January 27, 1913, a supplemental agreement was executed for the purpose of more clearly defining the rights and obligations of the parties to the original agreement; but it will be unnecessary to consider the provisions of this later agreement at this point. And on the 26th day of March, 1913, the parties entered into another agreement modifying section 12 of the original agreement in certain particulars not essential to the present consideration. On October 3, 1913, an agreement was closed between the parties whereby Dodge and his corporations in consideration of obtaining the signature of Fred A. Kribs and W. N. Jones to their note for $50,000, assigned to the said Kribs and Jones as collateral security 710 shares of the capital stock of the E. H. Dodge Lumber Company, and agreed upon reasonable demand to confer upon said Kribs and Jones the voting power of said stock, and also the voting power of the stock constituting a controlling interest in the Hamilton Creek Timber Company, the Rainier Lumber & Shingle Company, and the Patterson Lumber Company. And they also conveyed to said Kribs and Jones as collateral security their interest in said original and collateral contracts dated January 27, 1913. This agreement contained other conditions and provisions to secure said Kribs and Jones for extending their credit to the second parties. On

February 28, 1914, the holding company served upon Dodge and his corporations a written notice of forfeiture, asserting that they had made default in certain essential features of their contract particularly enumerated and designated in the notice; and notified them that said holding company elected to treat said contract as violated in certain fundamental features, and further notified them than unless they made payment of $6,000 and interest within thirty days from the date of the notice, and within said period proceed to carry out the other provisions of the contract concerning which they were in default, by entering upon and pushing to completion the Hamilton Creek railroad, and by completing the Rock Creek railroad by January 1, 1915, and by entering upon said logging operations as required by said contract, it would treat their rights under the contract as forfeited. And on the 12th day of May, 1914, the holding company executed a formal written declaration of forfeiture which contained an option available until January 1, 1915, to set aside said forfeiture and reinstate said contract upon furnishing said company with satisfactory evidence of financial responsibility to carry out said contract in strict accordance with its terms. Pursuant to this declaration of forfeiture the holding company took over the interest of the second parties and is now operating the logging business on its own account. When the forfeiture was declared the railroad up Hamilton Creek was completed for a distance of more than six miles. The construction of the Rock Creek railroad and the sawmill on section 35 was not begun. The sum of $215,000 provided by the contract for these purposes had been paid over to Dodge and his corporations, but logging operations had not begun."

The material allegations upon which plaintiff bases his claim for relief herein may be briefly summarized as follows: There is first a showing that plaintiff Stennick is the trustee in bankruptcy of the E. H. Dodge Lumber Company, the Hamilton Creek Timber Company, the Hamilton Creek Railroad Company, and of

E. H. Dodge; that the three corporations mentioned were organized under the laws of the State of Washington; that the J. K. Lumber Company is an Oregon corporation; that Kribs and Jones are large stockholders therein, Kribs being president and Jones treasurer, and that these two organized and own and control the corporation; that in 1912 Dodge owned a tract of timber land in Skamania County, Washington, upon which was 93,400,000 feet of standing timber, for which Dodge had paid $155,000, and which was worth $250,000; that in 1912 Kribs and Jones owned or were in process of acquiring a tract of between 8,000 and 9,000 acres of land adjacent to the land of Dodge. Then follows an allegation that in 1912 Jones and Kribs conspired in a fraudulent plan to take Dodge's land away from him by a fraudulent contract; the alleged fraudulent conspiracy being that they would by means of such contract induce Dodge to build a logging road to cost several hundred thousand dollars into the timber land owned by them, said contract to contain a forfeiture clause rendering it possible for Kribs and Jones to forfeit and take over said railroad at any time there should be a default in the essential conditions of said contract, which conditions could never be performed because of a shortage of the timber on the Jones and Kribs land below the amount represented by them as an inducement to Dodge to enter into the contract. After fully setting forth the nature and extent of the conspiracy the complaint charges the following alleged false representations: that Jones and Kribs would give Dodge and his corporation a quarter interest in a holding corporation which they proposed to organize; that they falsely represented and warranted that all the timber land would be included in the holdings of the new corporation, including Dodge's holdings and 75,000,000

feet which Kribs and Jones agreed to use their best efforts to acquire, and that Kribs and Jones' holdings contained a total stumpage of 658,895,000 feet, which amount they agreed to sell to Dodge and his corporation for the sum of $1,383,679.50, knowing at the time that there was a shortage in said timber of from 20 to 50 per cent below the quantity represented and warranted; that in order to facilitate the fraud and to successfully sell bonds to be issued in the sum of $900,000 Kribs and Jones made use of false cruises estimated prior to the time of the contract which grossly exaggerated the quantity of timber upon said lands and which represented the total amount of stumpage to be 658,895,000 feet, whereas they well knew that the amount of timber actually on said land was from 20 to 50 per cent less than the amount represented; that after these representations had been made, and Dodge had thereby been fraudulently inveigled into the scheme, a contract was entered into between a corporation which had been formed by Kribs and Jones and called the J. K. Lumber Company and Dodge and his corporations, which contract is annexed to the complaint, a brief synopsis thereof being contained in the excerpt from the opinion of the circuit judge above quoted; that the contract provided, among other things, that the sum of $215,000 arising from the sale of bonds should be turned over to the Dodge interests on or before May 1, 1913, to be used in building and equipping the road, but that no money was actually turned over until June 24, 1913, and that the Dodge interests having in reliance upon the contract begun work on April 1, 1913, found it necessary to advance $40,000 in order to carry on the construction of the road, and that owing to the delay of defendants in furnishing the money in accordance with the contract the work was greatly hin-

dered and carried over into a more inclement season
of the year, and that when the defendants began to
furnish money, it was not furnished promptly, thereby
greatly retarding and delaying the Dodge interests in
the work of construction, whereas if the $215,000 had
been furnished on May 1, 1915, the road could have been
commenced and completed before the winter season had
commenced at much less costs, and that thereby the
cost of building said road was increased to $370,464.31.
There are other allegations of fraud and failure of de-
fendants to perform their agreements, but it is imprac-
ticable to state them in full in this opinion.

There is another cause of suit stated which, in effect,
reiterates the charge of conspiracy, false representa-
tions, breach of warranty, and proceeds upon the theory
that defendants have themselves breached the contract
and destroyed it by failure to perform their part.  The
further and separate cause of suit repeats all the
charges of conspiracy and false representations con-
tained in the first cause of suit, recites the bankruptcy
of Dodge and his corporations, states that the only
asset of value in the hands of plaintiff is the Rainier
lumber mill, worth from $40,000 to $50,000, alleges lia-
bilities on the part of Dodge and his corporations
amounting to about $500,000, and declares that they
were solvent when the contract with defendants was
entered into, that the corporate property was then
worth $250,000, and that the value of their assets was
correspondingly diminished by entering into the con-
tract in question; that in attempting to build the rail-
road and in purchasing logs for their mill during the
summer of 1913, and while in good faith attempting
to carry out the contract with defendants E. H. Dodge
and his corporations became so involved that they were
petitioned into bankruptcy; that the contract with de-

fendants contained a forfeiture clause providing that upon a failure of the Dodge interests and the Hamilton Creek Timber Company to conform to the contract made with the defendants the defendants could forfeit the right of the Dodge interests in the Rainier Lumber & Shingle Company and in the railroad equipment, sawmill, and logging equipment in Skamania County; that early in 1914 the Dodge interests had constructed about 7 miles of railroad into the timber lands mentioned in said contract, that the value of said railroad equipment amounted to $374,461.31, and that the defendants, disregarding their own fraud in inveigling the Dodge interests into the contract, ignoring the fact that they had so misstated the quantity of timber growing upon the land described in the contract to such an extent as to make it impossible for the Dodge interests to comply therewith, and had delayed the construction of the road, and realizing that the Dodge interests must inevitably go into bankruptcy, and in order to give their fraud a color of legal right and thereby convert said property to their own use, in fraud of other creditors, sent a notice, dated February 27, 1914, to the effect that unless the Dodge interests carried out their contract with defendants, defendants would declare a forfeiture within 30 days. The complaint then recites that after sending said notice a meeting of the creditors of the bankrupts was called, and it was agreed between them and defendants that defendants would allow the original contract to be carried out by a committee composed of representatives of the creditors, of the defendants, and of the Dodge interests, and that a manager should be selected for that purpose after the Dodge interests should have secured the assent of 95 per cent of the creditors thereto; that thereupon Dodge in person carried out the agreement by securing the assent

of approximately 95 per cent of the creditors and the Dodge interests made the necessary financial arrangements to carry out said agreement, the said interests and the said creditors being wholly ignorant of the frauds and false representations practiced upon Dodge and his corporations by the defendants; that thereupon the Dodge interests contracted with Cox and Armstrong to begin logging operations, when the defendants disregarding their agreement declared a forfeiture and took possession of the property. It is further alleged that the forfeiture was illegal and void both on account of the fraudulent representations inducing the contract and because of the violation by defendants of the subsequent agreement with the Dodge interests and the creditors; that it was in fraud of creditors and merely a pretext to enable defendants to get all the assets of Dodge and his corporations in their own hands and to make it appear that they were justified in taking possession. In addition to the prayer in the first cause of suit there is an additional prayer that a trust be impressed upon the property for the benefit of all the creditors, and for general relief.      AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. Thomas Mannix* and *Mr. E. E. Coovert.*

For respondents there was a brief over the names of *Messrs. Clark, Skulason & Clark, Mr. Guy C. H. Corliss* and *Mr. W. S. Nash,* with oral arguments by *Mr. Alfred E. Clark* and *Mr. Corliss.*

MR. JUSTICE McBRIDE delivered the opinion of the court.

1. This suit has the distinction of containing the most extensive record in the matter of pleadings, testimony, and briefs of any case ever brought to this court. The

first cause of suit is for the rescission of the contract between Dodge and the defendants upon the ground of false representations by defendants whereby Dodge and his corporations were induced to enter into it. Conceding, without deciding, that the trustee in bankruptcy is authorized to bring a suit to set aside a contract on the ground of fraud, we will consider the question as to whether the allegations of fraud are borne out by the testimony. The principal misrepresentation complained of is that defendants falsely represented to Dodge that there was 658,895,000 feet of timber upon the land. No attempt was made by plaintiff upon the trial to establish the fact that there was any misrepresentation as to 48,886,000 feet contained in section 36, nor in the Dodge tract of 93,400,000 feet or in the land to be subsequently acquired, which is said to contain 75,000,000 feet. Confessedly all these figures are correct, and the controversy centers around the Kribs tract upon which the contract states there is 441,609,000 feet, and which the plaintiff claims actually contained something like 100,000,000 feet less. To make clear the exact situation at the time the contract was entered into it is necessary to recapitulate the circumstances and negotiations of the parties leading up to its execution. The pooling of the Dodge, Jones, and Kribs interests was first mooted late in the summer or early in the fall of 1912. At that time Dodge was the owner of a tract in Skamania County consisting of about 1,520 acres of timber land and tributary to Hamilton Creek as the route of which a logging railroad could be built to convey it to market. There was also school section 36 which Dodge had caused to be cruised and which he contemplated purchasing, being estimated by his cruisers to contain 48,886,000 feet. Jones and Kribs had adjoining these tracts and tributary to Rock

Creek as a means of access by a logging road 8,200 acres upon which their original cruises showed 441,-609,000 feet. Of the amount in the Kribs tract Jones had only a one-third interest in 260 acres, the rest of the land being owned by Kribs and his associates, but managed by Kribs individually. Dodge also owned two sawmills at Rainier, Oregon, which while going concerns do not appear to have been doing a profitable business.

The matter was discussed between the parties for some time and a tentative oral understanding arrived at, and pending the actual execution of the contract Dodge sent cruisers to examine and report upon the Kribs tract, who actually cruised more than three fourths of it before they were driven out by the winter snow. Dodge had their reports before he entered into the contract, and.it is apparent that so far as the cruise had gone it was satisfactory and coincided so nearly with the estimates of Kribs' cruisers that he was content to accept it. Cox, one of his cruisers who had cruised 2,807 acres, was put upon the stand, and his testimony indicates a substantial coincidence between his cruises and the summary of all the cruises furnished Dodge by Kribs and Jones. Porden, the other cruiser, claimed that he had destroyed the notes to his cruise after furnishing a copy to Dodge, but that copy is not produced by plaintiff and the presumption follows that it would, if produced, have been unfavorable to plaintiff's contention. In the cruise made by Cox he testified that he kept the dead timber separate from the other because he considered estimates upon that class of timber were extremely uncertain and that the only reliable test was cutting it out, but that he did not include any dead timber in his estimates which he did not consider merchantable. There was a considerable

quantity of dead timber shown by the Cox cruise. Porden also testifies that the dead timber cruised by him was separately itemized, so that it may safely be assumed that as to the six thousand and odd acres cruised by Cox and Porden, Dodge was fairly well informed as to its quality and quantity, and that there was, in fact, no material variance in the quantity of timber shown in the cruise-book furnished him by Kribs and Jones from that found by Cox and Porden. So that as to the 6,247.9 acres cruised by Cox and Porden, Dodge must be presumed to have acted upon the independent examination made for him by these two cruisers and not from representations made by defendants. This leaves 1,953 acres uncruised by Dodge before he entered into the contract. It is true that Cox advised him that the cruise of the dead timber might vary from his estimate and run either a little above or a little below it, with a probability that it would run below, but one fact stands out in bold relief, and that is that he was informed that there was a quantity of dead timber upon the tract, and that its value was, to some extent, uncertain. In fact, any cruise except a tree cruise is of necessity a mere estimate as Dodge must have known. The custom in these cruises, and generally, is to go twice through each 40 acres of a quarter-section, carefully noting the size, height, and soundness and apparent merchantability of the timber perceivable along the line followed, and to assume from the data thus gathered the average quantity of timber upon the tract. This average is an estimate. The lumber contents of the trees examined and their soundness and quality are mere estimates which may exceed or fall short upon an actual test in cutting or by an examination of each tree upon the tract, which latter would have been impracticable under the circumstances. There was a cruise-book of the whole tract

containing a summary of several cruises theretofore made by Kribs' cruisers which was given to Dodge before the contract was executed. From these cruises was derived the estimate of 441,000,000 feet which was placed in the contract. Both the defendants and Dodge knew that these cruises were merely estimates, and the testimony does not in our opinion disclose that there was any intention on the part of the defendants to place an extravagant estimate upon the amount of timber included in the contract. The plan was to transfer all the timber to the J. K. Lumber Company as a holding corporation, which should bond it for $900,000, which bonds Jones, Kribs, and Dodge were to underwrite. It was to the interest of all parties that every foot of merchantable timber on all of the tracts of Kribs and Jones and Dodge should appear in the contract as a basis for the proposed bond issue, and it was not to the ultimate advantage of any of the parties indorsing the proposed bonds that any extravagant or misleading estimate should appear therein. The safety of the indorsers lay in making the proposed project a success as a whole, and we are of the opinion that whatever the future cutting of the timber may disclose, Jones and Kribs were honestly of the opinion that the Kribs tract actually contained 441,000,000 feet of timber, and that their cruises justified them in this belief. Dodge testifies that Jones orally guaranteed in the presence of another person that there was 441,000,000 feet on the tract. This is denied by Jones, and the person in whose presence the alleged guaranty was made was not called as a witness; but, conceding that Dodge's statement is correct, it does not seem probable that Jones, who seems to be pecuniarily responsible, would have made a guaranty of this character in the presence of Percy Allen, an employee of Dodge, unless he be-

lieved the facts justified him in making it. The alleged guaranty appears in any event to have been merely a guaranty that the cruise of Jones and Kribs showed 441,000,000 feet. The whole conversation is thus detailed by Dodge:

"A. After seeing Mr. Cox, I went over and called up Mr. Jones and told Mr. Jones Mr. Cox had to come in for the reason that the snow shut him off and he could not cruise the timber; and that he advised me that I had better wait until spring to have the timber recruised.

"Q. What else took place at this time?

"A. And Mr. Jones said he could not wait until spring to have this timber cruised; that if we were to go ahead on this bond issue we had to go ahead now. I told Mr. Jones I did not want to go ahead under this proposition unless I had this timber cruised. He said, 'Well, I think we have some cruisers in our office, and I will go over those cruises,' and he came back and said he had figured up, I think—of course, in a day or two, and said they had four hundred and forty-one million feet up in that timber. I said, 'Well, I don't want to go ahead and sign this contract just on account of you saying you have four hundred and forty-one million feet of timber on those cruises there; I want some kind of a guaranty,' and Mr. Jones said, 'Well, we will have to go ahead with the contract or not, one or the other, and I have gone all over this cruise and checked them up, and there is four hundred and forty-one million feet there,' and I said, 'Do you say there is four hundred and forty-one million feet?' He says, 'I guarantee there is four hundred and forty-one million feet of merchantable timber up there on our cruise,' and consequently he put it into the contract and I signed it."

Dodge knew that Jones and Kribs had no other means of knowledge than their cruises which had been furnished him, and if Jones said, as claimed, "I guarantee there is four hundred and forty-one million feet of merchantable timber up there on our cruise," it could

be reasonably construed as signifying "according to our cruise."

2. So far as this branch of the case is concerned we do not find sufficient evidence to justify us in saying that the quantity of timber was intentionally misrepresented, nor does the fact that the substance of the alleged representation was written into the contract add to its efficacy or make it fraudulent. If Jones induced Dodge to execute the contract by falsely and fraudulently representing to him either orally or in the writing that there was one hundred million feet more timber on the tract than actually existed, then a rescission should be granted, or, if he recklessly made such a representation without knowing whether it was true or false, or without reason for believing it to be true, and it afterwards turned out to be false, a rescission should be granted provided the other elements necessary to a rescission are shown, not upon the ground of a breach of a written warranty, but because such alleged warranty also constituted a false and fraudulent representation inducing the contract.

3. Where it is sought to set aside a contract on the ground of fraud, the evidence should be clear and satisfactory; it being a maxim of law that fraud is never presumed: *Shebley* v. *Quatman,* 66 Or. 441 (134 Pac. 68); *Coffey* v. *Scott,* 66 Or. 465 (135 Pac. 85).

4. In order to have a rescission in this case plaintiff must show: (1) That defendants made a material representation; (2) that it was false; (3) that when defendants made it, they either knew it was false, or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that it was made with the intent that it should be acted upon by Dodge; (5) that he acted in reliance upon it; (6) that he thereby suffered injury. If any one of these requisites is

not established by a clear preponderance of the evidence, plaintiff cannot recover; and as before shown the evidence is insufficient in many particulars. There are no such allegations in the complaint as would authorize the court to rescind the contract on account of a mistake mutual or otherwise, nor is there such a condition shown by the testimony as to authorize the court to say that the defendants acted so recklessly that the representations were so grossly inaccurate as to amount to constructive fraud, and that, therefore, the contract should be rescinded. The case is based upon allegations of actual and intentional fraudulent representations, such as would support an action of deceit.

5. Again, conceding that defendant Jones made every representation and guaranty that Dodge claims, it is not sufficiently proved that such representations are false. Taking the testimony as a whole it appears quite as probable that there was 441,000,000 feet of merchantable timber upon the Kribs tract in 1912, when this contract was signed, as there was a smaller quantity. It does not follow that because fire had run through a portion of the tract and scorched and killed the timber all such timber was rendered valueless. The fire had occurred in 1902 and Kribs had purchased after that date up to 1906 various tracts, amounting in the aggregate to the 8,200 acres mentioned in the contract with Dodge. All the cruises made by him for the purpose of purchasing taken together indicate above 441,000,000 feet of merchantable timber upon the land, not necessarily green timber, but such as could be cut into lumber or otherwise made available on the market. A significant fact is found in the report of Captain Hill, who cruised a large portion of this tract in the interests of Mr. Elliott, who had an option on something over 6,000 acres of this tract; a portion of said report reading:

"On this tract there are fifty million feet of burned timber, and from trees examined in different parts of the burned area we found that the timber is still sound and in marketable condition, *and the condition indicates that it will be sound and marketable for from six to eight years from the date of this examination.*"

This opinion, given a little more than three years before the date of the contract in suit and by a disinterested expert acting for a prospective buyer, is entitled to weight and tends to show that the dead timber was, in fact, a value when the contract was made. We have carefully gone over all the cruises in evidence which were made before the contract was entered into, and assuming that they are fair and honest cruises made for the purpose of ascertaining the actual quantity of merchantable timber on the land we are of the opinion that there was upon the land at the time the contract was entered into substantially the quantity of merchantable timber represented. The Cox cruises made for Dodge before the contract was entered into and which are entitled to credit are a shade higher upon an average than the Kribs cruises, and the cruises made after this suit was in contemplation were so hasty and superficial in character, and are so at variance with other cruises made by men apparently reliable, we are not inclined to accept them. A few instances will suffice to show the wide difference between the cruises made before and after this action commenced; SE. ¼, Sec. 11, Tp. 37 E. Lacey & Co., cruiser for Brewer & Co., the bankers who were negotiating the prospective bond issue, reported 5,800,000 feet; Kribs' cruise, 5,200,000 feet; Cox, Dodge's cruiser, 6,820,000 feet; and McDonald, cruiser for plaintiff, 1,000,000 feet. On a tract in section 12, in the same township, Lacey estimated 13,654,000 feet; Kribs' cruise, 12,250,000 feet, Cox, 19,699,000 feet; and McDonald, only 4,400,000 feet.

On a quarter-section in section 13, in the same township, Lacey estimated 6,150,000 feet; Kribs' cruise, 5,850,000; Cox, 8,378,000 feet, and McDonald, only 1,200,000 feet. On another tract Lacey estimated 21,858,000 feet; Kribs' cruise, 22,210,000 feet; Cox, 22,687,000 feet; and McDonald, 6,900,000 feet. These differences run all through the cruises and differ so widely from the results obtained by other cruisers who had previously examined the tract that we cannot accept the McDonald cruise as fair in any particular. The testimony of J. S. McGinnis, offered by plaintiff to discredit the Kribs' cruise, is equally out of accord with all previous cruises. Thus upon Sec. 19, Tp. 3 R. 7 E., where Lacey & Co. estimated 18,364,000 feet, the Kribs' cruise, 22,210,000 feet, and Cox, 22,687,000 feet he estimates only 6,100,000 feet; in section 22, where Lacey & Co. estimate 46,697,000 feet, the Kribs' cruise, 54,970,000 feet, and Cox, cruising for Dodge, 56,551,000 feet, he gives only 27,700,000 feet; on section 30, where Lacey & Co. found 12,295,000 feet, the Kribs' cruise, 12,-355,000 feet, Grady, a cruiser for plaintiff, 10,225,000 feet, and Cox, cruiser for Dodge, 18,224,000 feet, he found only 4,930,000 feet. His estimates are so grossly at variance with all the other cruises made, not only for the Kribs' interests, but for the Brewer, Dodge, and plaintiff interests, that they cannot be relied upon. His testimony indicates either a very imperfect knowledge of cruising, or a very careless, slipshod method of putting what knowledge he had into practice. He claims to have cruised eight forty-acre tracts in one day, and asserts that three quarter-sections can be cruised in one day, which everyone familiar with cruising knows to be an impossibility, and is so shown by the testimony. A number of gentlemen more or less familiar with the lumbering business took a cursory

view of the tract, but their examination was confined
to walking across a portion of it and was too super-
ficial to give any weight to their testimony.   The plain-
tiff has succeeded in showing that there was a large
quantity of dead timber on the land, that the various
cruises included a portion of this as merchantable, and
that it is subject to deterioration and decay, but has
not in our judgment established the fact that any con-
siderable quantity of the timber shown in the Kribs'
cruises was unmerchantable at the time the contract
was entered into, or that unmerchantable dead timber
was included in the estimates which went to make up
the 441,000,000 feet mentioned in the contract.   It may
be an overestimate, or it may not.   Dodge knew that
there was a considerable quantity of dead timber in-
cluded in the estimates, and clause 8 of the contract
contained this provision:

"The second parties further agree that so far as
practicable they will first cut the burned timber on
Rock Creek in preference to the green timber," etc.

This indicates that the matter of dead timber had
been considered by the parties and that its quantity
was deemed of sufficient importance to make it the sub-
ject of affirmative mention in the contract, which would
hardly have been likely had it consisted of mere in-
considerable patches resulting from camp-fires.   We
do not believe that the contract was induced by any
fraud or false representations on the part of defend-
ants, and these charges appear to be an afterthought
when for reasons that have affected the whole logging
interests of the northwest the bright prospects for the
future of that industry proved to be illusory.   At the
time this contract was entered into there was a steady
demand for lumber in the east, which for reasons not
easily understood suddenly ceased.   There were

great expectations of profit to the industry from the opening of the Panama Canal, by means of which it was supposed that lumber could be sent to the east and Europe more expeditiously and at a reduced cost. It unfortunately happened that the canal was not opened for general commerce as soon as expected, and that when it did open an unexpected toll charge which would amount to $1,500 for every million feet of lumber passing through it was imposed. This alone would, if Dodge contemplated shipping the 50,000,000 feet he was to cut annually to the eastern market, reduce his annual profits by $75,000. Added to this the stringency in the money market which prevailed in 1913 and 1914 and the fact that his other lumbering operations were also affected, greatly in debt, and unprofitable, we find abundant reason for his failure to carry out his contract without imputing it to any sinister action on the part of defendants. In the light of circumstances as they appeared in 1913 the prospects of success for his venture seemed fair and his contract a good business proposition. As events actually turned out he was wrecked as many another good business man was from the same causes. In fact, he does not impute his bankruptcy to the shortage of timber, which he claims was not then discovered, but to other causes. In his testimony before the referee in the bankrupt proceedings Dodge admitted that he did not have enough liquid assets to offset his indebtedness, and that he was practically insolvent, and stated that his principal assets were the Rainier mill and the contract with the J. K. Lumber Company. Referring to the contract in suit he testified:

"I always considered it a good asset. * *

"Q. I mean if the timber market was good it would have been a good asset, and if the timber market was

the way it is at the present time it would have been
a poor asset?

"A. Yes."

The summing up of the learned circuit judge who
tried this cause below upon the question of false
representations is so cogent that we quote a portion
of it:

"It is contended that this and other statements re-
lating to the quantity of timber were expressions of
opinion or estimates, and not statements of fact; that
the amount of merchantable timber on this 8,000 acre
tract, situated as it is, was not susceptible of accurate
knowledge, and that the utmost one could do, was to
estimate the timber by means of cruises. It is clear
that this quantity was ascertained for the purpose of
the contract by computing the cruises contained in
the cruise-book, marked plaintiff's exhibit DD. This
is the same cruise-book that was delivered to Dodge
before the contract was signed. It contains cruises
by C. J. Clement, J. C. Murray, Charles Thom, Ben
McMullen, A. J. Bennison, P. C. Garrison, C. W.
Mead, and James D. Lacey & Co. All of these
cruisers verified their cruises by affidavit, except C.
W. Mead, whose affidavit could not then be procured,
and Lacey & Co. It comprised cruises previously
made and which were in the possession of Kribs.
Jones says they were collected by Frank Garrison, a
clerk in Kribs' office, at his direction, but without any
suggestion as to the selection of any particular
cruises. Clement's cruise was made about Novem-
ber, 1905; Murray's, about July 26, 1909; Thom's,
about May 1, 1906; McMullen's, about May 1, 1906;
Bennison's, about August 1, 1909; Garrison's, about
February, 1912, and Mead's, in 1907. These are the
cruises from which Jones computed the 441,000,000
feet on the Kribs tract. The cruise-book also in-
cluded the cruises of J. F. Cox of the Dodge tract,
section 36, and eight forties in section 31, duly verified
under the cruise date of June 2, 1912. Now, was this
body of timber capable of accurate ascertainment?

The land was broken and mountainous, and the evidence establishes beyond dispute that the only practical method of ascertaining the quantity of timber in a tract of this area and contour was by careful cruising by competent cruisers. I was impressed at the trial by the fact that accurate knowledge of the timber on this tract was impossible, and that owners and purchasers alike must depend upon the estimates of cruisers for their information. In cruising timber the human equation is always present, and the accuracy of the cruise depends upon the skill, the judgment, and the conscientious service of the cruiser. The extent to which the estimates of cruisers may vary is forcibly illustrated by the evidence in this suit. Under favorable and similar conditions, two cruisers of apparently equal ability will often vary greatly in their estimates. Representations should be considered in the light of existing conditions, and the physical facts should be kept in view, in construing this provision of the contract. And the situation and relative information of the parties should be considered. Both Jones and Dodge were familiar with timber cruising. Both had timber cruised before; it was part of their business. Dodge was the owner of timber adjacent to the Kribs tract which had been recently cruised. He had two other adjoining tracts cruised which he intended to buy. One of his business associates, and one of his employees, had taken a run through the Kribs tract. Two of his cruisers, Cox and Porden, had cruised over 6,000 acres of the Kribs 8,000 acre tract, and submitted a detailed report of their cruises, with a contour map which were available for inspection and comparison. He had the cruise-book in his possession upon which Jones' statement of quantity was based. So with these means of information, with these opportunities for comparison, and with the past experience in the timber and logging business, he entered into the contract. When the parties contracted concerning this timber their knowledge of the inaccuracy of timber cruising, and the practical impossibility of accurate knowledge of

the quantity of standing timber were present, existing facts, which cannot be excluded from their negotiations. They both knew that their estimates might vary; that the timber could not be expected to cut out in exact accordance with the estimates; that it might overrun or might shrink in the cut or scale. Dodge knew that Jones could not give him a definite statement of the Kribs timber, and Jones knew that Dodge could not give him a definite statement of the timber on the Dodge tract, on section 36, or on section 31. A reasonable margin of variance must have been within the contemplation of both parties. This cruise-book DD contained cruises procured by Kribs on his tract, and cruises procured by Dodge on his tract, and on the tracts he intended to purchase. These cruises were estimates only, but they formed the only basis on which negotiations could proceed. Jones evidently accepted Dodge's estimates, as shown by the cruise-book, on the three tracts in which Dodge was interested, and it is entirely reasonable to assume that Dodge accepted Jones' estimates on the Kribs tract, as shown by the cruise-book. Now these same cruise estimates, on the Kribs tract, on the Dodge tract, and on section 36, were taken and inserted in the contract. The Kribs tract was given as containing 441,609,000 feet, section 36 as containing 48,886,000 feet, and the Dodge tract as containing approximately 93,400,000 feet. These figures by that time must have become familiar to all of the contracting parties. Dodge says the cruise-book was delivered to him a couple of days before the contract was signed. I am inclined to think that his memory is at fault there. The testimony of Jones refutes this, and the circumstances attending the negotiations, point, in my opinion, to an earlier delivery. It appears that Brewer, the bonding broker, brought the parties together. Both evidently intended originally to secure separate and independent bond issues upon their properties. There were preliminary negotiations and conferences between the parties. Jones collected the cruises on the Kribs tract, Dodge collected those on his tracts, and all were bound together in the

cruise-book. Jones secured several copies and took one east on December 14, to deliver to Brewer, and says that he gave Dodge a copy before his departure. On December 12, Dodge sent J. F. Cox and Ben Porden up to the Kribs tract to cruise the timber. This was an independent investigation to determine the quantity of timber on the Kribs tract before the contract was signed. Cox cruised 2,807.9 acres, and Porden cruised 3,440 acres, aggregating 6,247.9 of the Kribs 8,000 tract, before they abandoned the cruise on account of the snow. Their cruise reports and a contour map were delivered to Dodge's office about January 10, which was about 16 days before the contract was signed. These cruises were available for comparison with the cruise-book. It is true Cox advised a recruise for the reason, as he says, that the cruise of the entire tract was not completed, and because they might have overlooked some defects on account of the snow. But he says that the cruise should not vary more than 5 per cent on account of weather conditions. Cox also cruised 920 acres of the Kribs tract in the fall of 1913, under ideal weather conditions. Cox was Dodge's cruiser, and the same man whose cruises of the Dodge tracts form a part of the cruise-book. If Cox's cruises were sufficient estimates of the Dodge timber as a basis for this contract, why were not his cruises on the Kribs tract useful and serviceable to Dodge in these negotiations? There is nothing in this record to impeach his honesty, or to detract from his capacity. Weather conditions might have affected his winter cruise to some extent. It is rather significant that the Cox cruises are generally higher on the same land than the Kribs cruises used in the cruise-book. Neither the Cox cruise, nor the Porden cruise was produced by the plaintiff, although they were both traced to Dodge's possession, and their absence was not explained to my satisfaction. The Cox cruise was available through original notes which Cox preserved, but the Porden cruise was not available, because Porden had lost or destroyed his original notes. But he identified the lands he had

cruised. Now with the Cox and Porden cruises in Dodge's possession about 16 or 17 days before the contract was signed, and with the Kribs cruises in his possession for at least a few days before it was signed, Dodge either compared the cruises and satisfied himself concerning the quantity of timber, or else he would appear to be lacking in reasonable prudence and diligence. I do not think they should have been ignored in this important transaction. Making due allowance for weather conditions, the cruise of more than three-fourths of the Kribs tract by Cox and Porden, should still have shown the run of timber on the tract. So I am persuaded from all the evidence, and the attending circumstances, that both parties contracted with the definite knowledge that the quantity of timber was not susceptible of accurate knowledge; that both parties knew that the quantities inserted in the contract were derived from a computation of cruises contained in the cruise-book; that neither had any source of information other than cruises; that their cruises were nothing more than estimates of cruisers, and that these statements of the quantity of timber were intended and understood by the contracting parties to express the estimates of the parties of the quantities of timber on the respective tracts; that, while the provision in question is positive in terms, it was based entirely upon estimates, and was only an estimate of that which was not susceptible of accurate knowledge, and was not intended, nor understood, to be a representation of a definite, ascertained quantity of timber."

6. Another alleged false representation is that the defendants for the purpose of inducing Dodge and his corporations to execute the contract promised that they would receive from Kribs and Jones a one-quarter interest in the corporation which they proposed to organize, which quarter interest would give Dodge and his corporations one quarter of the profits to be derived from such enterprise; that such promise was

fraudulently made with no intent to perform it, and that it was not performed. There was some discussion in the court below and in the briefs here as to whether failure to keep a promise to perform an act in the future and after the contract induced by it should have been fulfilled could be a ground for rescission; but passing by this question we are of the opinion that plaintiff has failed to prove that such promise was actually made. Dodge's testimony concerning the alleged promise is as follows:

"I says (to Jones), 'Well, I can see under this contract where I am going to get away.' He says, 'Well, what are you going to do about it?' I says, 'Well, I think I ought to have an interest in this proposition.' He says, 'What kind of an interest?' I says, 'Well, I think that I am entitled to some interest in the J. K. Lumber Company; I think I am entitled to a quarter interest for doing all this.' And Jones thought a while, didn't say anything, and I says, 'I think that is fair, that we should have that.' He says, 'Well, I will think the matter over and let you know.' So we held the thing off a little while, held this contract off, and he said, 'You fellows going to get busy with this thing?' And I said, 'I am waiting to hear from you.' So he came down and we went down to the Oregon Grill again. We sat down and had lunch, and he said, 'Well, to satisfy you if you will sign this agreement we will give you a quarter interest in the J. K. Lumber Company.' So I said—I think he said, I don't know whether it was exactly the J. K. Lumber Company or timber company to be formed, but I says, 'I will sign that agreement and the contract that way.' Then after we talked the proposition over I says, 'You pay the bills and I will have a quarter interest in the J. K. Lumber Company, if I cannot finance this thing and handle it that way.'"

Dodge also testified that at the preliminary talk with Jones on this subject Mr. Allen, a business asso-

ciate of his, was present. Allen testified that he had
no recollection of such a conversation and Jones posi-
tively denied it. Kribs denied making any such
promise, and this interest was not mentioned in
Dodge's schedule in bankruptcy, nor did he at any
time after the J. K. Lumber Company was organized
demand of any of the defendants any portion of the
stock. The alleged agreement is not shown by a pre-
ponderance of the testimony.

7. We will next consider the second cause of suit.
It reiterates the charges of false representations con-
tained in the first cause, and as to these nothing fur-
ther need be added. They are out of the case. The
complaint, however, goes farther and alleges facts
apparently upon the theory that conceding the con-
tract was fairly procured the defendants have so
breached it that it would be inequitable to allow a for-
feiture to stand. It was claimed by the defendants
upon the argument that a cause of suit to rescind a
contract upon the ground of fraud rendering it void
could not be joined with a cause of suit to set aside a
forfeiture prescribed in the same contract by reason
of a breach in its provisions; the first being, in effect,
a denial of the existence of a valid contract, and the
second an affirmation of its existence; and this seems
to be the general rule. However, in the case at bar
no demurrer for misjoinder was interposed; the only
demurrer filed being general as to each cause of suit.
Later a motion to compel the plaintiff to elect was
withdrawn or overruled by consent. In this state of
the case we will consider the second cause of suit
upon its merits as disclosed by the testimony. The
situation as to the railroad was this: The J. K. Lum-
ber Company had the legal title to the Dodge lands,
and to the Jones and Kribs lands as well. The legal

title to the road, therefore, vested in the J. K. Lumber Company subject to be reconveyed to the Dodge interests upon the performance by them of their contract. That this was the intent of the parties as well as the legal effect of the conveyance to be executed by the Dodge interests is clearly shown by clause 6 of the contract, which is as follows:

"It is further agreed that when the second parties shall have repaid to the first party the amount advanced by the first party for the construction of logging railroads, mills, and equipment over and above the amount paid by the second parties for the timber conveyed by second parties to the first party, that such logging railroads, mills, and equipment shall thereupon belong to said parties of the second part, subject, however, to the faithful performance of all of the covenants and agreements herein made by the second parties and subject also to the lien of said trust deed insofar as it may cover such property."

The forfeiture clause in the contract is as follows:

"The second parties agree that in the event of their failure to fully comply with all of the terms, conditions, and provisions of this agreement, the mill property of the Rainier Lumber & Shingle Company, now located at Rainier, Oregon, and the mill situated in section 35, township 3 north, range 7 east, Skamania County, Washington, and all of the railroad equipment, sawmill and logging equipment purchased for the logging of the lands covered by this agreement, either with funds of the first party or with funds of the second parties, shall forthwith become the property of the first party and may be used by said first party for the logging and manufacture of the logs and lumber of the timber referred to in this agreement or any other timber, and the second parties forthwith agree in the event of such default to transfer and convey all of such mill property by good and sufficient deeds of conveyance, and in the event of such default of the second parties, the first party

is hereby authorized to take possession of such mill property and equipment and use and employ the same, and said second parties agree not to interfere with such possession and use of said property of said first party.''

The land title itself being in the J. K. Lumber Company, the road built upon the land became a part of it, and a forfeiture of the land necessarily carried with it the roadbed, and it was only necessary to designate the equipment, which did not become part of the realty, to bring all the improvements under the forfeiture clause, and this was done. So that for a substantial breach of the conditions of the contract by the Dodge interests the J. K. Lumber Company, upon declaration of its intention to enforce the forfeiture, had a right to take possession of the property described therein, except the mill property at Rainier, which for reasons hereinafter shown could not be the subject of forfeiture, not being embraced in the property conveyed under the contract.

8–10. It is claimed that the alleged forfeiture clause is, in fact, a penalty, and not a forfeiture, and that for this reason the defendants had no right to seize the property. It is a familiar rule of law that courts will always be reluctant to enforce a forfeiture and no language will be construed to work one where a contrary intent can be derived from a consideration of the whole instrument or from the circumstances attending its execution: *Oregon R. & N. Co.* v. *McDonald,* 58 Or. 228 (122 Pac. 413, 32 L. R. A. (N. S.) 117, note). Now the words ''forfeiture'' and ''penalty,'' while often used interchangeably, are not always synonymous, that is to say, a forfeiture is not always or necessarily a penalty. The principal distinction between the two is that in contracts and in civil mat-

ters generally the term "penalty" invariably imports a clause in an agreement by which the obligor agrees to pay a certain sum of money if he shall fail to fulfill the contract contained in the same agreement: Bouvier Dict., tit. "Penalty"; *Tayloe* v. *Sandiford,* 20 U. S. (7 Wheat.) 13 (5 L. Ed. 384); *Watt's Exrs.* v. *Sheappard,* 2 Ala. 425; *State ex rel. Rhodes* v. *Warner,* 197 Mo. 650 (94 S. W. 962); *Huntington* v. *Attrill,* 146 U. S. 657 (36 L. Ed. 1123, 13 Sup. Ct. Rep. 224). A forfeiture, on the other hand, is a broader term and may include not only the payment of a sum of money but the loss of property or of some right in it by reason of failure or neglect of a party to perform a contract. Where a contract provides that a party shall forfeit a sum of money in case of failure to perform a contract, the courts, if such a construction seems reasonable in view of all the circumstances, will treat the stipulation as a penalty rather than as an agreement for liquidated damages (which would amount to a pure forfeiture of the whole sum stipulated), and will allow the promisee to recover only such amount as will cover his actual damages by reason of the breach.

"A forfeiture is a deprivation or destruction of a right in consequence of a nonperformance of some obligation or condition": *Webster* v. *Dwelling House Ins. Co.,* 53 Ohio St. 556 (42 N. E. 546, 53 Am. St. Rep. 658, 30 L. R. A. 719).

"The omission or neglect of a duty which a party binds himself to perform, or to the performance of which he is enjoined by law, is on a breach thereof called a forfeiture, that is, the advantages accruing from the performance of the thing are by his omission defeated and determined": *Beard* v. *Beard,* 22 Ky. (6 T. B. Mon.) 430.

"Forfeiture is a divestiture of property without compensation in consequence of a default or offense":

*Union Glass Co.* v. *First National Bank,* 10 Pa. Co. Ct. Rep. 565.

"Forfeiture relates to something done or omitted by which one's rights are lost. There can be no forfeiture of a contract that has no existence. Forfeiture assumes a pre-existing valid contract or obligation": *Roblee* v. *Masonic Life Assn.,* 38 Misc. Rep. 481 (77 N. Y. Supp. 1098).

It will thus be seen that while the words "penalty" and "forfeiture" are frequently used interchangeably, and while often the legal effect of their use is the same, that such a construction in an instrument relating to the loss or destruction of a right under a contract is impossible. The reason is apparent. In a case where a person agrees to perform a certain act or to pay a certain sum of money the court under certain circumstances may be able to say that the sum agreed to be paid is so disproportionate to the injury suffered it will hold the stipulation to be a mere penalty intended only to cover any actual damages that may ensue from a breach, that is, if the sum to be forfeited were fixed at $500 and the actual damages were only $100, the court under some circumstances, not all by any means, might award the promisee $100; but in a case where the thing to be forfeited is a property right dependent upon the payment of purchase price or the performance of some condition, the court cannot say to the promisee:

"The contract provides that the right to 160 acres of land shall be forfeited, but you are damaged only to the extent of 80 acres. Therefore, we will apportion that quantity to you instead of the 160 acres mentioned in the contract."

The court must enforce the forfeiture as it finds it, or not at all. It has no leeway to substitute damages for the forfeiture mentioned in the contract. In

*Seeck* v. *Jakel,* 71 Or. 35 (141 Pac. 211, L. R. A. 1915A, 679), which was an action in ejectment brought for breach of a condition in a deed whereby the purchasers bound themselves not to carry on a particular business upon the granted premises, the defendants in their answer made the following tender:

"(The defendants) offer and tender to the plaintiffs any damage which the plaintiffs may have sustained by reason of a livery business being carried on on said premises by the defendants A. J. Newman and J. W. Newman, in case the court adjudges that the said provision against carrying on said business on said premises is a lawful provision." This court said: "We can only enforce the condition subsequent as we find it embodied in the deed. We find nothing in the pleadings or the testimony authorizing us to relieve the defendant, or to enlarge the estate which he knowingly and voluntarily purchased, encumbered as it was by the condition named."

So here, if we find from the language of the agreement that the intent of. the parties was to prescribe a forfeiture as the result of noncompliance by the Dodge interests with the terms of the contract, it is our duty to ascertain the facts, and if our investigation discloses that there has been such failure to live up to its terms, we should, unless such failure has been occasioned by the inequitable conduct of the defendants, declare the legal results of such failure.

11. Again, declaring a forfeiture for breach of the conditions of a contract is not rescission of the contract. It puts an end to the contract and extinguishes it in pursuance to its terms just as performance extinguishes it. The act of taking possession under a forfeiture clause is not an act of rescission or in avoidance of the contract, but the assertion of a right growing out of it. A contracts with B thus:

"If I fail to do a certain act at a particular time, you may take to yourself the interest or right that I have in the property, the legal title of which is in you."

A fails to do the act, and B takes possession of the property. Here is, in fact, no rescission of the contract by A, but merely the exercise of a contract right. The forfeiture takes the place of performance.

To discuss the evidence in detail would consume more space in the reports than would be practicable. It is sufficient to say that it fully supports every charge of default made in the notice of forfeiture, and that the exigencies of the case were such that the defendants were forced to the alternative of either taking the property and trying to save something out of it or of allowing the interest on the $900,000 bond issue to default, and the property to be sold at a probable or, at least, possible sacrifice. The defendants being indorsers on the bonds were in a precarious position. The Dodge institutions and himself were practically insolvent and could raise no more money. They had fallen down on the contract and were unable to proceed further, and it is apparent that their creditors never agreed to and never would have agreed to take up the Dodge contract where he left off and complete it in the depressed condition that the lumber market then was, and still is. It is true that the creditors discussed the matter, but arrived at no favorable result, and the testimony of Mr. Stennick shows that they could have arrived at none. If present lumber conditions continue, it is evident that there will be no profit in logging the lands described in the contract that will more than suffice to pay the bonds and interest if every foot of timber claimed by the defendants to be upon the land is actually there.

Any profit is purely speculative and dependent upon a return of former favorable conditions. No unprejudiced person can read this testimony and not be impressed with the idea that defendants as a matter of self-interest were desirous that Dodge should succeed in carrying out his contract and that they performed their part of it and more, advancing money and loaning their credit to enable him to borrow and evincing in every way a desire to make the project a success. Whether he failed because of the prevailing depression in the lumber market or from mismanagement or through attempting to carry out a contract too large for his resources cannot alter the fact that his failure cannot be traced to any act of defendants.

Other interesting questions have been discussed in the briefs, but we have chosen rather to decide this case upon its merits than upon the technical matters presented. We have read and re-read the evidence presented in the 3,000 pages of transcript and given much attention to the elaborate briefs of counsel, and upon the whole are satisfied that the decree of the Circuit Court should be affirmed.        Affirmed.

---

Modified and affirmed on rehearing July 31, mandate recalled and
corrected as to costs September 19, 1917.

## On Rehearing.

(166 Pac. 951.)

*Mr. Thomas Mannix* and *Mr. E. E. Coovert,* for appellant.

*Messrs. Clark, Skulason & Clark, Mr. Guy C. H. Corliss* and *Mr. W. S. Nash,* for respondents.

In Banc.   Opinion PER CURIAM.

12. The questions raised upon the hearing have necessitated a review and checking up of all the points touched upon in the original opinion.   Relating to the first cause of suit we are in entire accord with the original opinion and with the opinion and decree of the court below.   In relation to the second cause of suit it was erroneously assumed that the objection that there was a misjoinder of causes of suit was not well taken because there had been no demurrer interposed on that ground; Mr. Justice McBRIDE who wrote the opinion saying:

"It was claimed by the defendants upon the argument that a cause of suit to rescind a contract upon the ground of fraud rendering it void could not be joined with a cause of suit to set aside a forfeiture prescribed in the same contract by reason of a breach in its provisions, the first being, in effect, a denial of the existence of a valid contract, and the second an affirmation of its existence; and this seems to be the general rule.   However, in the case at bar no demurrer for misjoinder was interposed; the only demurrer filed being general as to each cause of suit.   Later a motion to compel the plaintiff to elect was withdrawn or overruled by consent.   In this state of the case we will consider the second cause of suit upon its merits as disclosed by the testimony": *Stennick* v. *J. K. Lumber Co., ante,* p. 473 (161 Pac. 97).

Upon a re-examination of the voluminous transcript we discover that a demurrer for misjoinder was filed and overruled on March 9, 1915.   We are of the opinion that the objection was well taken and that the bill was clearly multifarious.   While the court below overruled the demurrer, the opinion rendered as well as the final decree make it evident that it proceeded upon the theory that this was a suit for a rescission of the contract

upon the ground of fraud, and not otherwise. In addition to the learned opinion of the court below given upon the principal case, which only the lack of space prevents us from incorporating here, the Circuit Court upon a motion for re-examination of the case rendered the following additional opinion, which we give in full:

"Since the decision was rendered the plaintiff has presented a motion for a decision that will fully determine and adjust the equities in this suit. The motion and argument were addressed mainly to the forfeiture which was declared under the provisions of the contract. I concluded early in this litigation that this was not a suit to be relieved from a forfeiture, but that it was a suit to rescind the contract for fraud inducing its execution. In that view I could only consider those negotiations which were had before, or at the time of execution, since proceedings taken after execution could not have induced the contract. It appeared plain that a suit to rescind and a suit to be relieved from a forfeiture could not be maintained together, because they are inconsistent remedies; one in repudiation and the other in affirmance of the contract; that if both remedies were pursued together the bill would be multifarious and vulnerable to the demurrer. So this demurrer was overruled upon the assumption that one cause of suit was stated, and that a suit to rescind. These remedies being inconsistent, the adoption of the one was the exclusion of the other. The entire theory of the case as indicated by the pleadings, the evidence, and the arguments was the rescission of the contract for false representations of the quantity of timber. Fraud was the controlling issue, and the disposition of that issue was decisive of the case. I did not regard the averments relating to the forfeiture as raising a distinct or vital issue, nor one having a direct bearing upon the issue of fraud, but merely as disclosing the later contractual relations of the parties, and important only to advise the court of the existing situation in case a rescission was decreed. But, aside from the question of con-

sistency, I could not relieve against the forfeiture, because the conditions do not exist upon which that relief could be granted. There is neither a disposition nor apparent ability to perform the obligations of the contract if the forfeiture were removed. This remedy presupposes an intention and ability to perform, and is usually provided by an interlocutory decree, extending the time of performance and suspending the forfeiture during that period. I take it to be elementary that such relief cannot be granted at the suit of a party who declines to perform his part of the contract, and who disclaims in advance any intention to comply with its provisions. I am unable to follow counsel for plaintiff in his contention that the forfeiture should be removed, and the *status quo* restored, or its equivalent attained by a decree for money. This would involve not only relief against the forfeiture, but also a rescission of the contract on account of the forfeiture. I have given this cause diligent and conscientious service. Every contention of the plaintiff has been considered, and in this I have never been unmindful of the unfortunate situation in which the bankrupts have been placed. But I must decide this suit upon the law and the evidence. I am firmly convinced that fraud was not established, and this failing the present suit must fail. Any other available remedy the plaintiff may have will not be prejudiced by the decree. For the rest, the appellate court will correct any unconscious errors that I have made.''

There was a practical election on the part of counsel to try the case as one for the rescission of a contract upon the ground of fraud. At the beginning of the trial in answer to a remark of the court counsel for defendants replied:

''Certainly we are not proceeding on any theory of affirming this contract; we are proceeding upon the theory of disaffirming it, and we claim the right to introduce evidence—

"The Court: The inquiry you desire to make in the question of warranty is in so far as that constitutes misrepresentation?

"Counsel for Defendants: Absolutely."

So it appears that the whole case was tried out upon the theory that if there were no fraudulent misrepresentation and no breach of the contract by the defendants, there was no right to recover in this suit. The subsidiary questions raised in plaintiff's alleged second cause of suit, and again urged here, were properly considered as not involved in that issue as they were pleaded and could only be pleaded upon the theory that there was a valid and subsisting contract, whereas the suit for rescission was in disaffirmance of the original agreement upon the theory that it was invalid. What is said, therefore, in the original opinion upon those matters relating peculiarly to the alleged second cause of suit may be regarded as *dictum*.

It is urged that certain property taken possession of by the defendants upon the forfeiture is shown by the evidence to belong to the Yule Logging Company and not to the Dodge interests; but for the reason above stated, as well as for the additional reason that that company is not a party to this suit and has been and is yet at liberty to litigate its own property rights with defendants, we are not authorized to consider that phase of the case.

As explained and modified herein we adhere to our original opinion, and the decree of the Circuit Court is affirmed as rendered.

Opinion Modified and Adhered to.

No Costs Allowed Either Party.