STENNICK v. JONES et al.

(Circuit Court of Appeals, Ninth Circuit. August 6, 1918.)

No. 3139.

1. Logs and Logging ☞3(7)—Contracts—Construction.
    Under a contract for the purchase and sale of stumpage, which provided that bankrupts should construct a railroad with funds furnished by defendant, etc., *held*, that the title to the road was to remain in defendant until certain advances were repaid, though part of the money represented the purchase price of stumpage conveyed by the bankrupts to such defendant.

2. Vendor and Purchaser ☞335—Part Performance—Relief.
    Where defendant was ready and willing to proceed and did not rescind the contract, the bankrupts, though they advanced money and did acts in part performance, were not entitled, after default, to recover back what was advanced or done.

3. Damages ☞74—Forfeiture—Agreement.
    Where a contract is for a long time, and of a character where actual damages are uncertain of estimation, a provision for a forfeiture in case of substantial breach will be enforced after inquiry, provided it is not unconscionable.

4. Damages ☞77—Construction—Provisions for Liquidated Damages.
    Whether a stipulation to pay a sum of money in event of breach of contract is to be regarded as a penalty or an agreed ascertainment of damages is to be determined from the intent of the parties as gathered from the contract.

5. Damages ☞85—Forfeiture Clause.
    Under a contract providing for the sale of stumpage and construction of a railroad by the bankrupts with funds to be advanced by one of the defendants, *held*, that the forfeiture clause included the railroad and equipment, and, being reasonable, defendant was, on bankrupts' breach, entitled to enforce a forfeiture of the whole property.

6. Damages ☞85—Breach—Waiver.
    Where no objection was made to defendant's delay in furnishing money to construct a railroad, such delay, though a technical breach of the contract, must be deemed waived, and does not deprive defendant of the right to enforce a forfeiture in event of nonperformance by the opposite party.

7. Contracts ☞316(1)—Breach—Waiver.
    Where a supplemental contract provided that in event defendant, who was to furnish funds to construct a railroad, was unable to sell bonds on or before a date fixed, either party might rescind, and neither rescinded, the failure of defendant to furnish funds before the date fixed was waived.

8. Logs and Logging ☞3(7)—Contracts—Construction—Breach.
    A contract providing for the construction of a railway by the bankrupts, etc., and for the acquisition by defendant, which was to furnish the

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

funds, of certain timber lands, *held* not broken by defendant, though there was a delay on its part in acquiring the lands.

9. BANKRUPTCY ⬤⇒163—PREFERENCES—WHAT CONSTITUTES.

Where a contract between the bankrupts and defendant, which furnished funds to enable the bankrupts to construct a railway, provided that, on the bankrupts' default, defendant should be entitled to forfeit the property, etc., *held*, that a voluntary delivery of the property to defendant, the bankrupts having defaulted, was not a preferential transfer, under Bankr. Act, §§ 60, 70e (Comp. St. 1916, §§ 9644, 9654).

10. LOGS AND LOGGING ⬤⇒3(7)—CONTRACTS—CONSTRUCTION—FORFEITURE.

Where a contract for the construction by the bankrupts of a railroad in connection with a lumbering project authorized defendant, which was financing the project, to declare a forfeiture on the bankrupts' breach, *held*, that the forfeiture provisions did not extend to property of the bankrupts not used in constructing the road or otherwise included in the contract.

11. BANKRUPTCY ⬤⇒287(3)—ACCOUNTING—EQUITY—JURISDICTION.

Where defendant declared a forfeiture under a contract providing for the construction of a railroad by the bankrupts, *held* that, on a suit for an accounting by the trustee of the bankrupts, in which general relief was prayed, the court had authority to grant relief on account of the forfeiture of property not included in the contract, and the trustee was not required to bring action at law for conversion.

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit by Parker Stennick, trustee in bankruptcy for the Hamilton Creek Timber Company and the Rainier Lumber & Shingle Company, against Willard N. Jones and others. From a decree for defendants, complainant appeals. Reversed and remanded.

Thomas Mannix and Guy L. Wallace, both of Portland, Or., for appellant.

Guy C. H. Corliss, of Portland, Or., for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

HUNT, Circuit Judge. This is a suit by Stennick, trustee in bankruptcy, against three certain defendants for an accounting for certain personal property transferred to the defendant Jones and others, and for value of certain improvements, and that defendants be required to pay for the same to the trustee in bankruptcy for the benefit of creditors, and that a trust fund be declared out of which the creditors may share, and for general relief.

In 1912 one Dodge owned about 1,520 acres, and defendants 8,200 acres, of timber land in Skamania county, Wash. Jones had one-third interest in 260 acres with defendant Kribs. Kribs owned one-third interest in the remaining part of the land, the other two-thirds being owned by outside persons. Dodge then owned two sawmills, and certain relatives of his controlled the Dodge Lumber Company of San Francisco.

After negotiations an agreement was reached to the effect that the timber lands owned by Kribs and Jones and Dodge and the outside parties should be transferred, and they were transferred to J. K. Lumber Company, organized by Kribs and Jones, and bonded for $900,000

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

bonds, and trust deed being dated January 1, 1913. On January 27, 1917, the J. K. Lumber Company, to be called "The J. K. Company," as party of the first part, and the Hamilton Creek Timber Company, called the "Hamilton Company," the Rainier Lumber & Shingle Company, called the "Rainier Company," and E. H. Dodge, as parties of the second part, made a written contract containing substantially these provisions: After reciting that the parties of the first part owned and were about to acquire timber lands as security for an issue of bonds, and that the parties of the second part were desirous of cutting and manufacturing timber, and were willing to convey to the first party certain timber owned by them, the J. K. Company agreed that it had or would acquire title to about 8,000 acres of timber land in Skamania county, Wash., on which there were, in round numbers, 441,000,000 feet of timber, and that it would use its best endeavors forthwith to get title to approximately 75,000,000 feet of additional timber in a near-by section; that when it acquired title to the timber it would mortgage the same as security for the bond issue of $900,000; that it would use and apply from the proceeds of the bonds such necessary sums, not exceeding $215,000, as might be needed to construct two railroads for logging, one up Hamilton creek, the other up Rock creek; to construct and equip a sawmill with a capacity of 20,000,000 feet of lumber per annum; to purchase railroad equipment for both railroads, and construct and equip logging camps capable of handling 300,000 feet of logs per day. The Hamilton creek railroad was to be completed within six months after the fund of $215,000 was available, and the Rock creek railroad was to be finished within one year after the completion of the construction of the Hamilton creek road. The parties of the second part agreed to "arrange for and carry on all the construction work and obtain the equipment and proceed forthwith to construct as required." The J. K. Company was to pay over moneys as needed for construction and equipment from the bond sale proceeds, upon receipt from the Hamilton and Rainier Companies and Dodge of bills therefor and certified accounts of expenditures certified and verified to be correct by the president or treasurer of the Rainier Company. The Hamilton and Rainier Companies and Dodge agreed to convey to the J. K. Company, before the trust deed was recorded, good title to certain described lands, containing thereon approximately 93,400,000 feet of timber. The Hamilton and Rainier Companies and Dodge contracted to repay to the J. K. Company the difference between $155,000, the price to be paid for the lands containing the 93,400,000 feet, and the amount actually expended by the J. K. Company for construction and equipment as provided by the provisions of the contract, in 10 equal annual payments, on December 15th of each year, with interest at 6 per cent. per annum. The J. K. Company, when the land was released from the trust deed and the timber removed, was to convey back the fee of all lands conveyed by the parties of the second part. The J. K. Company agreed to sell, and Dodge and the Hamilton and Rainier Companies were to buy, 658,000,000 feet of timber on the land then owned or to be acquired by the J. K. Company for $1,383,000, with interest from January 1, 1913, at designated prices per thousand for the year 1913,

prices increasing each year after 1913, payments to be made to the trustees under the trust, or until the bonds were paid, and thereafter payments to go to the J. K. Company.

It was agreed that when Dodge and his associates shall have repaid to the J. K. Company the amounts advanced for construction and logging and mills and equipment over and above the amount paid by the Dodge people for the timber conveyed by them to the J. K. Company, that the railroads, mills, and equipments should "thereupon belong" to Dodge and the lumber companies, subject, however, to the faithful performance of the covenants and agreements made by Dodge and the lumber companies, and subject also to the lien of the trust, or in so far as it might cover such property. The Hamilton and Rainier Companies and Dodge agreed to cut not less than 50,000,000 feet during each calendar year, and, in the event of failure, to pay to the J. K. Company certain specified amounts as values. After certain provisions with respect to the use of money derived from the logging and manufacture of timber and the selection of timber first to be cut, there was a forfeiture clause as follows:

"(11) The second parties agree that in the event of their failure to fully comply with all of the terms, conditions, and provisions of this agreement, the mill property of the Rainier Lumber & Shingle Company, now located at Rainier, Oregon, and the mill situated in section thirty-five (35), township three (3) north, range seven (7) east, Skamania county, Washington, and all of the railroad equipment, sawmill and logging equipment purchased for the logging of the lands covered by this agreement, either with funds of the first party or with funds of the second parties, shall forthwith become the property of the first party, and may be used by said first party for the logging and manufacture of the logs and lumber of the timber referred to in this agreement or any other timber, and the second parties forthwith agree in the event of such default to transfer and convey all of such mill property by good and sufficient deeds of conveyance, and in the event of such default of the second parties, the first party is hereby authorized to take possession of such mill property and equipment and use and employ the same, and said second parties agree not to interfere with such possession and use of said property by said first party."

Another agreement supplementary to the one just referred to was made January 27, 1913, providing, among other things, that, in the event of the failure of the J. K. Company to provide necessary funds for the construction and equipment of the railroads and sawmills contemplated in the original agreement, on or before May 1, 1913, the J. K. Company, at the request of the Dodge interests, would reconvey the lands and timber conveyed or to be conveyed free and clear of all incumbrances by the J. K. Company. It was also agreed that neither the J. K. Company nor Jones nor Kribs would acquire any interest in timber land adjoining a certain tract described in the original agreement, except the 75,000,000 feet which was to be acquired under the original agreement; that the J. K. Company, when all the timber should be paid for, would allow the Dodge people interest on $1,383,000 from January 1, 1913, to the day when the $215,000 for construction purposes was made available to the Dodge interests; and that in the event of the failure of the J. K. Company to sell the bonds provided for in the original agreement, on or before May 1,

1913, either of the parties to the original agreement or to the supplementary agreement should have the option to declare the original and supplementary agreements void and of no effect.

Railroad construction up Hamilton Creek was commenced in the spring of 1913, but the road was never completed. When December, 1913, arrived Dodge had drawn $215,000, and under the evidence was without funds and was really insolvent, although the fact of his involved financial condition does not appear to have been known to Jones or Kribs or the J. K. Company.

While the Dodge interests were thus seriously embarrassed financially and on October 3, 1913, another agreement was made between the parties to the previous agreements with a view of securing Kribs and Jones for joining Dodge and his companies in a note for $50,000. By this agreement Dodge and his companies assigned to Kribs and Jones as collateral certain shares in the Dodge Lumber Company, with agreement respecting the voting power of said stock, and the voting power constituting a controlling interest in the Hamilton and Rainier Companies, and another lumber company, and also conveyed to Kribs and Jones, as collateral security, the interest of the makers of the note in the original and supplemental contracts made January 27, 1913.

On July 1, 1914, there would be due the interest on the $750,000 of bonds which had been issued, and six months thereafter another installment of interest would be due. Taxes would also have to be considered. Furthermore, it appears that Dodge had not paid the $6,000 due December 15, 1913, or the interest on the $60,000, as required by the provisions of the contract providing for payment of such sum in 10 equal payments with interest at 6 per cent. per annum. Nor had he finished the construction and equipment of the Hamilton creek railroad, nor had he done anything toward the construction of the Rock creek railroad, nor had he commenced to construct a sawmill. The evidence is very clear that the financial situation of Dodge and his associates was such that he would be wholly unable to proceed to carry out the terms and provisions of his contract. Then it was, about February 28, 1914, that the J. K. Company notified Dodge and the Rainier and Hamilton Companies (for brevity called "associate companies") that they were in default in certain features of the contract, and that the J. K. Company would treat the contract as violated, and that unless payment was made of $6,000 with interest within 30 days from the date of the notice, and that unless Dodge and his associates proceeded to carry out the other provisions of the contract with respect to which they were in default, by proceeding to complete the Hamilton Creek Railroad and the Rock Creek Railroad by January 1, 1915, and by proceeding with the logging operations as required by the contract, it, the J. K. Company, would treat their rights under the agreement as having been forfeited, and would take possession under the contract.

Negotiations between creditors and the Dodge people with a view to some settlement were pending, but did not assume any definite form. On May 12, 1914, the J. K. Company served a formal declara-

tion of "forfeiture," but gave an option available until January 1, 1915, to Dodge and his companies, or any other persons or corpora-. tions, "to set aside the forfeiture" and "reinstate" the contract, provided they furnished the J. K. Company with satisfactory evidence of financial ability to proceed with the contract in accordance with its terms. The J. K. Company, acting in accord with this declaration of forfeiture, took possession of the interest of Dodge and his associates, and proceeded to carry on the logging business on its own account. The creditors of the Dodge interests, after consideration of the whole situation,. including the wisdom of bankruptcy proceedings, finally on June 27, 1914, concluded not to go on with any plan whereby the creditors were to carry out the logging contract.

Thereafter,. in July, 1914, involuntary petitions in bankruptcy were filed against Dodge and his associate companies, and after adjudications Stennick, plaintiff herein, was appointed trustee of all the bankrupts. .

Thereafter the trustee brought suit in the state court in Oregon to rescind the contract for fraud, especially in misrepresenting the quantity of timber on the Kribs tract, but the court, after hearing evidence, found no fraud, and upon appeal the Supreme Court of the state affirmed the decree of the lower court. Stennick v. J. K. Lumber Co., 85 Or. 444, 161 Pac. 97. The Supreme Court in the learned opinion of Mr. Justice McBride also considered the alleged breaches of the contract by the J. K. Company, and, after discussing the forfeiture clause and the situation of the parties, took the view that the clause was enforceable. But on motion for rehearing the court stated that the original opinion rendered had been·filed in the belief that under the record issues besides that of fraud were directly involved, whereas they were not, and therefore what had been said upon matters other than fraud might be regarded as dictum. Stennick v. J. K. Lumber Co., 85 Or. 444, 166 Pac. 951. .

Thereafter in the federal court the trustee instituted the present suit, made up of three causes of' action, wherein he seeks to have the alleged transfer made May 12, 1914, declared a preferential one, and to have the forfeiture clause of the contract held to be of no validity, and in no event as including all the property, particularly the railroad, taken .by defendants acting under the contract. The court heard evidence and dismissed the bill upon the merits, and the trustee appealed.

[1] Much of appellant's argument is to the point that the contract required the Hamilton and Rainier Companies to furnish and provide their own railroad plant and equipment for the purpose of carrying out the contract, and that the $155,000 which was to be paid for lands containing 93,400,000 feet of timber belonged exclusively and absolutely to the bankrupt corporations in lieu of their timber land; that the Jones and Kribs interests were to lend the bankrupt corporations the additional sum of $60,000 over and above the $155,000 to aid in providing the railroad plant and equipment, this $60,000 to be secured by mortgage or lien on the railroad plant and equipment and to be paid in the 10 equal annual installments, as more fully detailed in the

statement of the contents of the contract, and that the Jones and Kribs interests had no financial interest in the railroad plant, equipment, and other property except the $60,000 loan.

The error of this position is made clear by consideration of the following facts and circumstances: The main thing in the contract was sale and purchase of stumpage. Neither of the bankrupts nor Dodge had the legal title to the railroad which in fact was to be built upon J. K. Company lands out of moneys derived from the sale of the bonds of the J. K. Company. The Dodge people had rights to cut timber on stipulated terms. The contract was predicated upon such an arrangement, and by the language employed we gather that the purpose of the parties was that the legal title to the right of way and of the railroad itself, as well as of all other property, should remain in the J. K. Company until that company was fully repaid $60,000 of the $215,000 furnished by it to aid in the construction and equipment of the road. The $60,000 was to be repaid in the 10 annual installments, and when it was paid then Dodge was to receive a legal title to the railroad. Reference to the pertinent clauses of the agreement shows that it was after the Dodge people shall have repaid to the J. K. Company the amount advanced for the construction and equipment over and above the amount paid by the Dodge people to the J. K. people that the railroad and equipment should belong to the Dodge people subject to the performance under the contract. Thus the attitude of the J. K. Company became like that of a vendor who has made a contract of conditional sale expressly retaining legal title until the property shall have been fully paid for by the vendee. Some confirmation of this view is to be found in the provision of the contract wherein the J. K. Company agreed to give to the Dodge people a right of way over lands owned by the J. K. Company, or to be owned by it, for railroad purposes, with logging rights, and upon performance of the contract to convey to the Dodge people good title thereto upon condition that the right of way should be used for railroad purposes only. But there was no present grant of a right of way; it was an executory contract to convey at a future time when the parties of the second part had performed. It cannot be disputed that Dodge was ultimately to be paid $155,000 for his land, but there was no provision that such sum was to be paid to him when the $215,000 was turned over to the Dodge people. The $215,000 to come from bond sales was to be put at the disposition of Dodge expressly in order to enable him to construct, with a view to get at the timber. The money furnished, however, was that of the J. K. Lumber Company. In proceeding with the work of development Dodge's position was analogous to that of an agent for a principal. That this is the true view is also shown by the provisions of the agreement that the total amount of money to be furnished by the J. K. Company "for all the purposes above mentioned" should not exceed $215,000, and that the Dodge people should arrange for or carry on all such construction work and arrange for the purchase of equipment. Evidently, by the language itself, construction and equipment were the uses to which the $215,000 were to be put, not purchase of timber or land.

The specific agreement that, when the Dodge interests had repaid the sum advanced for construction and equipment over and above the amount paid by the Dodge interests for the timber conveyed to the J. K. Company, the railroads, mills, and equipment should "thereupon" belong to the Dodge people, is so plain in fixing the condition and event when ownership should attach that it becomes susceptible of but the one construction.

It is also clear that the trust deed included all of the railroad property and equipment, land and all, and was not executed by Dodge or the Dodge corporations, but only by the J. K. Company, which issued the bonds, and which turned over the $215,000 to Dodge to proceed with under the contract. Dodge had an equity in the timber and in all of the other property referred to in the contract, but the essential points which call for consideration are that it was the J. K. Company which was really expending the $215,000, and that the contract pertains to the expenditure by the J. K. Company of this sum for the purposes of construction and equipment, as specifically mentioned in the contract.

[2-5] To the contract, as we have expressed our understanding of it, the relation of the forfeiture clause is next to be considered. It is urged that the parties meant the forfeiture clause to give to the J. K. Company the right of user as distinguished from the right of ownership in the event of a substantial breach, and that, if it had been intended that the forfeiture clause should be liquidated in its nature, the railroad would have been expressly included in the clause. Affairs had drifted to a situation, however, where, as already shown, there was a substantial breach by the Dodge interests, for they had not only failed in executing most important undertakings on their part, but they had refused to proceed with their contract. The fact that they had advanced money and done acts in part performance could not relieve them of their obligations under the contract. The J. K. Company were ready and willing to proceed. Hence the rule of contract laid down in Hansborough v. Peck, 5 Wall. 497, 18 L. Ed. 520, fits the case, and the Dodge interests will not be permitted to recover back what was advanced or done. The J. K. Company did not rescind the contract. Their attitude was to hold fast and give to Dodge opportunity to proceed, and to do so even by reinstatement and extension under the terms of the contract. Refusal by the Dodge people followed, and the J. K. Company, acting under the terms of clause 11 of the contract, became owners, with right of user, and were given possession by the Dodge interest and took possession. Sanders v. Brock, 230 Pa. 609, 79 Atl. 772, 35 L. R. A. (N. S.) 532. Cases may be multiplied where, upon an equitable showing to excuse a breach of contract, courts of equity have compelled a party who has received money to reconvey or refund. Such cases are usually where there has been a rescission of the contract by the one party or a mutual rescission, and where the facts disclose that the purchaser is equitably entitled to recover back purchase money. There are also many decisions where, the measure of damages for the breach of a contract by a vendor being ascertainable without difficulty, forfeiture will not be

enforced. But these equitable doctrines do not override the principle that parties may make a contract to run for years, and of a character where, actual damages being uncertain of estimation, there may be provision for a forfeiture or transfer of ownership in case of a substantial breach, which the courts, after inquiry, will enforce. Edmunds v. Spanish R. P. & P. Co. (D. C.) 206 Fed. 92. The principle which controls and as upheld in Sun Printing & Publishing Co. v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, is that the intent of the parties is to be arrived at by a proper construction of the agreement; and whether a particular stipulation to pay a sum of money is to be regarded as a penalty, or as an agreed ascertainment of damages, is to be determined by the contract, and it is the duty of the court, where the damages are uncertain and have been liquidated by an agreement, to enforce the contract. Among other things the court there said:

"The principle seems to be, from a consideration of all the authorities, that where the parties are competent to contract, are equally masters of the situation, and deal at arm's length, the court of equity will not disturb the measure of damages established by the parties themselves, unless it is so grossly unconscionable and oppressive as to shock the conscience of the court, and lead it to believe that, although so nominated in the bond, in the letter, it is not included within the spirit of the contract, or within the contemplation of the parties."

In the present case the doctrine stated is clearly applicable, for the evidence is that in the first notice of forfeiture the J. K. Company gave Dodge 30 days in which to make the $6,000 payment which he had failed to make when due, and also gave him 30 days in which to proceed and execute the other clauses of the agreement. More than that, after the 30 days had expired, and until May 12, 1914, efforts, which must be accepted as had in the best of faith, were made with creditors of Dodge to work to some solution of the difficulties which were presented. But in June the creditors concluded that they would not go on with the contract, and, as Dodge and his associates were wholly unable to proceed, there occurred the fundamental breach, which, particularly considering the serious financial obligations of the J. K. Company, authorized the J. K. Company to act by taking possession and proceeding with logging operations. Possession of the lands, title to which was in the J. K. Company, must have included possession of the railroad bed and mill on the lands; and keeping in view the main purposes of the contract, that it was an executory one for the sale and purchase of stumpage on certain land, the proper construction is that the forfeiture clause was meant by the parties to cover and control the damages to be awarded by the one in default if it should occur that the contract as a whole was not carried out. Hoagland v. Segur, 38 N. J. Law, 230; Pomeroy's Eq. Juris. § 442, pp. 741, 744; Story, Equity, pp. 775, 778. It is clear that the equipment, not part of the realty, was designated and brought under the forfeiture clause. Ranger v. Great Western, 5 H. L. Cases, 71, is not directly pertinent to the provisions of the contract here involved.

Appellant makes no strong showing for equitable relief, as under

the evidence the damages which the appellees have suffered seem to have been considerably greater than the value of the property forfeited. The difference between the contract price of the stumpage on one of the tracts and the value of such stumpage at the time of the breach of the contract by the Dodge interests was over $480,000, to which should be added the $60,000 due and the $50,000 loaned on the note.

[6, 7] It is earnestly said that in May, 1914, when the forfeiture was availed of, the J. K. Company was in no position to insist on forfeiture, because it had itself broken the contract by (a) failure to furnish the $215,000 within the time specified in the contract; (b) not purchasing the 75,000,000 feet of timber as called for by the contract. There was a delay which ran beyond May 1, 1913, the date named in the contract when the J. K. Company was to furnish the $215,000 to Dodge. This delay, which extended until some time in June, was because of obstacles in the matter of the sale of the $900,000 of bonds; but it was disregarded at the time by Dodge, who went on with no word of dissatisfaction, and worked under the contract, and drew moneys as needed, until he had exhausted the whole $215,000, and could get no financial support to go further. Dodge cannot on this account now avoid the right which the contract gave to the J. K. Company to enforce the forfeiture clause upon grounds already discussed. Phillips v. Todd (Mo. App.) 180 S. W. 1039. Furthermore, under one of the supplementary contracts between the parties, it was expressly provided that if the J. K. Company was unable to sell the bonds on or before May 1, 1913, either party might rescind the contract. Neither party elected to rescind.

[8] With respect to the contemplated purchase of 75,000,000 feet of timber, it is to be remembered that the J. K. Company was to use its best endeavors to acquire title to such quantity as might be agreed upon by the parties to the contract. 15,000,000 feet were acquired. The evidence goes to show that while there was discussion over this timber there was no definite selection of the timber by Dodge. Jones and Kribs deny that there was any understanding concerning the particular 75,000,000 feet and its acquisition by any definite time, and Dodge testified that the acquisition of such timber was to be had by using $150,000 to be reserved from the bond sale money. It is evident that Dodge never made a demand that any of this timber be purchased and never expected that it would be until the bonds had been sold. The trust deed itself contemplated the sale of bonds for purchase of timber at not over $1.25 a thousand feet, and that good title would be vested in the J. K. Company. To carry this plan out might have taken some time, and we do not think that, in the absence of any complaint at the time, default on the part of the J. K. Company can be inferred merely because it did not act more promptly.

It is said that under the terms of the contract over 441,000,000 feet of timber was to be paid for absolutely, whether in existence or not, and that there was a shortage of 50,000,000 feet, which could not be made up by including 50,000,000 feet of "burned stumps of

no merchantable value." The assumption is unwarranted, as there is ample evidence that much of this 50,000,000 feet was cruised as merchantable, and in fact was. Estimates of timber were, of practical necessity, the guiding features in settlements to be made, and, there being no bad faith, estimates must control. If the timber actually cut had exceeded the amount of the estimate, Dodge would have had the benefit; it was fair for both parties.

[9] We cannot see how the transaction of May 19th, when the bankrupt concerns voluntarily delivered over to the J. K. Company, can be held to have been a preferential transfer as defined by the bankruptcy statutes. Sections 60, 70e, Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 562, 565 [Comp. St. 1916, §§ 9644, 9654]). The J. K. Company had the right to act not as a general creditor, but under the contract, and the Dodge interests yielded their possession under the provisions of the contract. Park v. Cameron, 237 U. S. 616, 35 Sup. Ct. 719, 59 L. Ed. 1147; Harris v. First Nat. Bank, 216 U. S. 382, 30 Sup. Ct. 296, 54 L. Ed. 528.

[10] Appellant asks a ruling that, even if it be held that the railroad equipment and plant were part of the realty, the defendants should nevertheless pay for the value of certain property, such as utensils of trade, which was taken, but was not included at all in the contract.

Of course, the J. K. Company was limited in its rights by the contract, and could take no property which belonged to the bankrupts except that which was clearly affected by the provisions of the contract, and which we have said is confined to the property included in the contract. This is too plain for discussion; and equally certain is it that the trustee in bankruptcy has a remedy whereby he can recover any such property so wrongfully taken or the value thereof for the benefit of the creditors. All property, therefore, which was bought by Dodge out of the $215,000 was fairly within the terms of the contract and became subject to forfeiture. But other property not purchased out of such fund, and not attached to the realty, should rightfully pass to the trustee.

[11] The appellees, however, take the position that even if property outside the contract was taken, there can be no recovery for such property in this suit, which is for accounting, and that the trustee's remedy is by an action at law for conversion. With this proposition we cannot agree. The suit being for accounting and general relief, and the issue as to what property was affected by expenditure under the contract having been testified to as one involved, the court may retain the cause, and require that an accounting be made by the defendants to the trustee for any and all property taken by them or any of them not embraced in the contract as we have construed it. Camp v. Boyd, 229 U. S. 522, 33 Sup. Ct. 785, 57 L. Ed. 1317.

As it would be more practicable that an accounting should be had before the District Court, which did not allow in favor of the trustee any account for the value of any personal property taken by defendants, not bought with any of the $215,000 heretofore referred to, we think that the case should go back to the District Court, with di-

rections that, under the declarations of the rights of the parties as indicated, an account be taken, and thereafter decree be entered upon the matters referred to as may be equitable and just.

Reversed and remanded.

